**F I L E D**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN GOSS,

           Petitioner-Appellant,

   v.

MICHAEL NELSON, Warden, and
ATTORNEY GENERAL OF THE
STATE OF KANSAS,

           Respondents-Appellees.

No. 03-3133

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 99-CV-3202-SAC)**

---

Elizabeth Seale Cateforis, The Paul E. Wilson Defender Project, University of
Kansas Law School, Lawrence, Kansas, for Petitioner-Appellant.

Kristafer R. Ailslieger, Assistant Attorney General (Jared S. Maag, Assistant
Attorney General with him on the brief), Office of the Attorney General for the
State of Kansas, Topeka, Kansas, for Respondents-Appellees.

---

Before **McCONNELL** , **HOLLOWAY** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

## I. Introduction

The question presented in this appeal is whether pretrial publicity denied John Goss a fair trial. Goss's claim arises from pretrial press coverage of the September 1986 murder of his former girlfriend, Janice Amerin, and the subsequent manhunt that culminated in his arrest. Ms. Amerin lived in the small town of Plains, Kansas, which is located in Meade County in the southwest part of the state on the Oklahoma border. She was shot and killed in her parents' home, with her mother as an eyewitness to the crime. The victim's mother identified Goss as the suspect who fled the murder scene in Ms. Amerin's car.

At the time of the crime, the population of Meade County was approximately 5,000, and the population of Plains was approximately 1,800. The murder was the first in Meade County in more than seventy years, and the victim and her family were well-known and respected members of the community. Following the murder, local law enforcement and residents engaged in an unsuccessful field-by-field manhunt in search of Goss. He was found two weeks later hiding in a small town in northwestern Oklahoma. Local and regional media covered the crime and the manhunt. In addition, the case gained statewide notoriety after a gubernatorial candidate referenced Goss's release from prison shortly before the murder in a campaign brochure calling for harsher punishment for violent crimes.

In October 1987, a jury convicted Goss of first-degree murder and unlawful possession of a firearm. Goss subsequently filed a petition for habeas relief, pursuant to 28 U.S.C. § 2254, in federal district court, arguing that pretrial publicity prejudiced the jury that heard his case and denied him a fundamentally fair trial. This appeal arises from the district court's denial of his petition. Finding that the Kansas courts properly applied United States Supreme Court precedent governing constitutional challenges to pretrial publicity, we AFFIRM the district court's decision.

## II. Factual and Procedural Background

The essential facts underlying Goss's crimes are not in dispute. As set forth by the Kansas Supreme Court during the direct appeal:

> Janice Amerin resided with her parents near Plains. On September 8, 1986, as Janice was preparing to leave for work, [Goss] appeared at the residence. He and Janice had dated sporadically. Shirletta Amerin, Janice's mother, heard her daughter screaming in the garage. She rushed to the scene and saw Janice and [Goss] struggling. [Goss] forced Janice into her automobile. As [Goss] was attempting to start the vehicle, Janice broke away and started running for the house. [Goss] fired two shots at her before Janice ran inside the home. [Goss] followed and Shirletta heard more shots. [Goss] then returned to the garage and drove away in Janice's car.
>
> Shirletta ran into the house and found her daughter standing in the kitchen. Janice told her she had been shot by [Goss]. An ambulance was called but Janice died before it arrived. An autopsy revealed Janice had been shot three times. On his way to the Amerin home, the Meade County Sheriff saw Janice's car in a ditch, with footprints from the vehicle pointing north into a milo field. A fruitless

manhunt was organized. On September 22, 1986, [Goss] was arrested in Tyrone, Oklahoma.

*State v. Goss*, 777 P.2d 781, 783 (Kan. 1989).

Goss sought a change of trial venue because of the press coverage. The trial court evaluated the effect of pretrial publicity in ruling on two motions to change venue. The first motion and ruling occurred in March 1987, seven months prior to trial. The court recognized that, although the case had already "received a significant . . . [and] extraordinary amount of attention from the press," publicity "in and of itself does not demonstrate entitlement to a change of venue." R. 11 at 41. The court found insufficient evidence that the publicity had affected "the people of Meade County to such a point that they're going to carry with them an attitude that would deprive [Goss] of a fair trial." *Id.* at 39. Thus, the court concluded that Goss had failed to meet his burden of proof but allowed him the opportunity to raise the issue again if he could develop further evidence. *Id.* at 41–42.

The second motion to change venue was heard only one month before trial, in September 1987. In support of his motion, Goss called nine witnesses whose names were chosen at random from the local phonebook. Seven of the witnesses initially testified on direct examination that they had a preconceived opinion that Goss was guilty. Upon further questioning, however, three of the seven said they could put aside their opinions and give Goss a fair trial. Based on his review of

the evidence, including his finding that five of nine witnesses could be impartial, the trial court denied Goss's motion to change venue, concluding that (1) it was "not convinced that the pretrial publicity in this matter was of such a nature so as to preclude or raise the likelihood that a fair and impartial jury cannot be impounded in Meade County," and (2) "Meade County residents who are not directly associated with the victim's family by friendship or association could put aside any and all pretrial publicity that has been aired so far and make decisions based upon the evidence that is introduced at the trial." R. 9 at 61–62.

Jury selection occurred in two sessions on October 14, 1987. The court called a total of 120 people from the community as potential jurors, eighty-eight of whom were questioned. The court excluded forty-seven for cause. After peremptory challenges, fourteen were selected to serve as jurors and alternates. Goss did not object to the seating of the jury.

After a three-day trial, the jury convicted Goss. He was sentenced to three consecutive life terms on the murder count and to a consecutive term of three to ten years on the firearm count. At that time, Kansas did not have the death penalty.

On appeal, the Kansas Supreme Court affirmed the trial court's ruling on Goss's motion to change venue and on the convictions. *Goss*, 777 P.2d at 788. The state supreme court found that the trial court did not abuse its discretion in

denying the motions, providing two reasons for its conclusion. *Id*. at 786. First, citing to the change of venue hearing, the court found an adequate number of potential jurors in the jury pool who "passed the test" of impartiality. *Id.* Second, the court found the trial court "was generous with excusing jurors for cause, but, even so, a jury was selected in less than a day" and "Defendant passed the remaining prospective jurors for cause." *Id.*[1]

On June 14, 1999, Goss filed this § 2254 action claiming the Kansas Supreme Court's decision regarding his motion to change venue represented an unreasonable application of federal law as determined by the United States Supreme Court. A magistrate judge recommended the petition be granted based on a finding that the pretrial publicity was so extensive that prejudice could be presumed under Supreme Court precedent. The district court, however, rejected the magistrate's recommendation, finding Goss did not show his case "was tried in such a corruptive atmosphere that neither a fair trial or an impartial jury could be presumed." Dist. Ct. Order, Mar. 27, 2003, at 12. The court determined the extent of the publicity fell "far short" of establishing presumed prejudice and

---

[1] After losing his direct appeal, Goss petitioned the trial court for post-conviction relief based on a claim that he did not receive a fair and impartial trial as a result of his trial counsel's ineffective assistance. The trial court denied the petition. The Kansas Court of Appeals summarily affirmed and also denied Goss's motion for rehearing en banc. The Kansas Supreme Court denied review. The district court denied a certificate of appealability on this issue, and Goss did not raise it again before this court.

-6-

therefore held that "the Kansas Supreme Court's finding regarding the impartiality of the jury in petitioner's trial was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent."  *Id.*

The district court granted a certificate of appealability to this court, *see* 28 U.S.C. § 2253(c), on the question of whether the Kansas courts' denial of the motion to change venue violated Goss's Sixth Amendment right to an impartial jury and fair trial.  Goss now argues the pretrial publicity and community sentiment following the murder should have caused the state courts to conclude that any jury empaneled in Meade County would be fatally prejudiced against Goss, in violation of his constitutional rights.

### III.  Standard of Review

Since Goss filed his federal habeas petition after enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, the Act governs our review.  *Wallace v. Ward*, 191 F.3d 1235, 1240 (10th Cir. 1999).  Where a state court adjudicates the merits of a claim underlying a federal habeas petition, AEDPA requires a federal court to deny the claim unless the state court decision (1) is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in state court.  28 U.S.C. § 2254(d).

This court reviews de novo a district court's denial of a habeas petition. *Beem v. McKune*, 317 F.3d 1175, 1179 (10th Cir. 2003) (en banc). Since the Kansas courts adjudicated the merits of Goss's motion to change venue, we will only reverse the district court's denial of the habeas petition if we conclude, after an independent review of the record, that Goss is entitled to relief under § 2254(d).

Pursuant to § 2254(d)(1), a state court decision is contrary to established federal law as determined by the United States Supreme Court "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court decision is an unreasonable application of federal law under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. An objective standard is used to evaluate the reasonableness of the state court's application of federal law. *Id*. at 409–10. Importantly, "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively *unreasonable*." *Penry v. Johnson*, 532 U.S. 782, 793 (2001) (emphasis added).

Under AEDPA, a state court's factual determinations are afforded a presumption of correctness. § 2254(e)(1). Petitioner carries the burden of rebutting the presumption of correctness by clear and convincing evidence. *Id.*

A state trial court's finding regarding the impartiality of particular jurors is a question of fact. *Patton v. Yount*, 467 U.S. 1025, 1036, 1037 n.12 (1984). Only when a manifest error occurs can a federal habeas court overturn a state court's finding regarding jury impartiality as a whole. *Id.* at 1031. This standard also applies to any questions about the impact of pretrial publicity on the jury pool. *Swindler v. Lockhart*, 885 F.2d 1342, 1347 (8th Cir. 1989). Accordingly, our court independently evaluates testimony with respect to bias to decide whether the state court committed manifest error by holding the jury was sufficiently impartial. *Grancorvitz v. Franklin*, 890 F.2d 34, 39 (7th Cir. 1989).

## IV. Discussion

The Sixth Amendment as incorporated by the Fourteenth Amendment guarantees the right of a trial by jury in all state criminal cases. *Duncan v. Louisiana*, 391 U.S. 145, 150 (1968). The Fourteenth Amendment's Due Process Clause independently requires the impartiality of any jury empaneled to hear a case in a state court. *Irvin v. Dowd*, 366 U.S. 717 (1961). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of

impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Id.* at 722.

Potential jurors, however, are not expected to be totally ignorant of the facts surrounding a case. Rather, jurors are sufficiently impartial under constitutional standards if they can lay aside any preconceived opinions regarding the outcome of the case and "render a verdict based on the evidence presented in court." *Id*. at 723. Criminal defendants bear the burden of establishing juror partiality. *Id.*

Goss challenges the denial of habeas relief solely on the ground of prejudicial pretrial publicity. He argues "[w]hen the totality of the circumstances are considered, the evidence shows a cohesive community convinced, before the trial, of the guilt of the defendant and thus unable to afford Mr. Goss a fair trial." Aplt. Br. at 15. Therefore, he argues, the trial court abused its discretion in denying a change of venue.

Importantly, however, Goss has not argued that the jury actually selected was, in fact, prejudiced. Indeed, Goss exercised his peremptory challenges and passed the jury for cause, and did not object to the seating of any particular juror. Rather, his argument is that the pervasive pretrial publicity and evidence of community sentiment at jury selection demonstrate any jury from Meade County would be presumptively prejudiced.

## A. Supreme Court Framework

The United States Supreme Court has examined due process concerns stemming from pretrial publicity in two contexts. The first context occurs where the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community. We "presume prejudice" before trial in those cases, and a venue change is necessary. The second context is where the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.

### 1. Pretrial Publicity

The Supreme Court has found presumed prejudice based on pretrial publicity in only three cases, all dating from the 1960s. In the first, *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court found such widespread community exposure to the defendant and his crime—and his locally televised confession—that it need not even reach the jury selection stage to conclude that a change of venue was necessary: "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id*. at 726.

In the second case, *Estes v. Texas*, 381 U.S. 532 (1965), the Court reversed a conviction where the jury pool was first exposed to extensive televised pretrial

publicity, which was then followed by a circus-like atmosphere at trial due to television cameras in the courtroom. 381 U.S. at 535–36, 543–44.

The final case where prejudice was presumed on publicity grounds alone is *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In that case, the Supreme Court reversed the conviction of an Ohio doctor for the murder of his wife after finding his trial corrupted by "the massive, pervasive and prejudicial publicity that attended [the defendant's] prosecution." 384 U.S. at 335. The Court based its conclusion on both the publicity itself and the trial judge's failure to insulate the defendant from the impact of the publicity, as exemplified by the Court's statement that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Id*. at 355.

To be sure, cases where the courts presume prejudice based on pretrial publicity alone are rare. The key in those cases, the Supreme Court has explained, is that "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings . . . . The proceedings in those cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799 (1975).

-12-

In this circuit, in summarizing these cases, we held that prejudice will only be presumed where publicity "created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial." *Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 1994). In other words,

> [T]o demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community" . . . . "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." This presumed prejudice is "rarely invoked and only in extreme circumstances."

*Id.* (quoting *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994)). In *Hale*, we went on to find no pretrial prejudice since the bulk of the press coverage occurred seven months prior to trial, even though thirty-four of thirty-seven potential jurors had prior knowledge of the case.

### 2. Jury Selection

Another line of Supreme Court cases looks to the effect of pretrial publicity on jury selection to determine whether, in fact, it had such a pervasive effect so as to deny the seating of a fair jury. The first major case examining the effect of pretrial publicity on jury selection is *Irvin v. Dowd*, *supra*. In *Irvin*, the Court looked at the results of jury selection and found a biased jury pool arising from "a barrage of newspaper headlines, articles, cartoons and pictures [that] was unleashed against [the defendant] during the six or seven months preceding his

-13-

trial." 366 U.S. at 725. The print and broadcast publicity preceding trial revealed prejudicial details of the defendant's background, including a reference to a crime committed as a juvenile, his prior convictions for arson, and his confession to six murders, including the murder for which he was convicted in the case. *Id*. at 725–26. Examining the selection process, the Court emphasized that (1) the trial court had excused 268 of 430 veniremen for cause due to fixed opinions as to the guilt of the defendant; (2) an astounding 90% of prospective jurors when asked, "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty"; and (3) most damaging, eight of twelve jurors actually seated "thought [defendant] was guilty." *Id*. at 727.

In a trilogy of more recent cases, the Supreme Court has refined the application of *Irvin* to claims of biased jury pools. In the first case, *Murphy v. Florida*, *supra*, the Court rejected a presumed prejudice claim because the largely factual publicity in the record appeared several months before trial and its effect on jury selection appeared to be relatively modest: the trial court excused for cause only twenty of seventy-eight potential jurors due to an opinion as to the defendant's guilt. *Id*. at 802–03. Similarly, in *Patton* v. *Yount*, *supra*, the Court declined to find presumed prejudice even where (1) pretrial publicity revealed inadmissible information such as defendant's prior conviction for murder and his confession; (2) over three quarters (77%) of potential jurors admitted they would

-14-

carry an opinion as to defendant's guilt into the jury box; and (3) eight of the fourteen jurors and alternates actually seated admitted that, at some time, they had formed an opinion as to the defendant's guilt. *Id*. at 1029–30. The Court found that even daily coverage of the voir dire was not critical since it was "purely factual" and since there was no "barrage of inflammatory publicity immediately prior to trial." *Id.* at 1032–33. Finally, in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Court discounted claims of media coverage even where eight of twelve seated jurors had read or heard something about the case prior to trial.

\* \* \*

These two lines of cases establish that while substantial "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed," *Patton*, 467 U.S. at 1031, they do not "stand for the proposition that juror exposure to . . . news accounts of the crime with which [the defendant] is charged alone presumptively deprives the defendant of due process." *Murphy*, 421 U.S. at 799. Interpreting this precedent, we noted in the Oklahoma City bombing case, where media scrutiny was at its zenith, the following:

> [I]n order for the reviewing court to reach a presumption that inflammatory pretrial publicity so permeated the community as to render impossible the seating of an impartial jury, the court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial.

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998). In those circumstances, "we simply cannot rely on 'jurors' claims that they can be impartial' and [must] declare the publicity to be prejudicial as a matter of law." *Id.* at 1182 (quoting *Patton*, 467 U.S. at 1031). But, as we also noted in *McVeigh*, "despite the proliferation of the news media and its technology, the Supreme Court has not found a single case of presumed prejudice in this country since the watershed case of *Sheppard*" in 1966. *Id.*

## B. Application

While significant, the facts of this case do not meet the high hurdle established by Supreme Court precedent for finding presumed prejudice. Goss contends the Kansas Supreme Court's decision was an unreasonable application of the relevant precedent in two related ways, which parallel the two lines of cases detailed above. He argues the decision (1) failed to adequately consider the sense of community outrage and prejudice generated by the publicity prior to trial, and (2) discounted the effect of the publicity on potential jurors at jury selection. In Goss's view, consideration of "the totality of the circumstances shows a cohesive community convinced, before the trial, of the guilt of the defendant." Aplt. Br. at 15. We discuss and reject his contentions below.

### 1. Prejudice Prior to Trial

Little doubt exists that the murder of Janice Amerin and the subsequent manhunt for and capture of Goss generated substantial press coverage and community interest. The murder occurred in a rural community. It was the first homicide in seventy years. The victim was a member of a well-recognized local farm family. The manhunt following the murder involved numerous local law enforcement officers and residents.

Following the crime, a number of articles were published about the murder and manhunt. Some articles that appeared between the murder and Goss's capture mentioned Goss's prior criminal record, concerns about the parole process evidenced by Goss's release from prison only eleven days before the crime, and the prosecution's goal of putting Goss in prison for life. Another article around the time of Goss's capture quoted the judge who would later preside over Goss's trial in a manner that suggested the judge was already convinced of Goss's guilt. The judge was commenting about a potential parolee in an unrelated case and his propensity for violence. He stated, "I don't see [the potential parolee] as the kind of guy who's going to go out and commit further acts of violence, but I didn't see Goss that way, either." R. 2 at 58. This trial judge also recognized the high level of publicity surrounding Goss's case, referring to it as "extraordinary." R. 11 at 41. Other articles revealed raw sentiments by local residents. For instance, an

article that appeared in a Hutchinson, Kansas newspaper quoted a resident stating, "If they find him I hope he'll shoot himself or they'll shoot him." R. 2 at 18–19.

The case also acquired statewide publicity when it became an issue in the 1986 Kansas gubernatorial campaign. A challenger to the incumbent governor produced a campaign brochure using the crime as an example of lax parole standards. The brochure concluded Goss was guilty of murder. The brochure also referred to Goss as a "walking time bomb" and provided details of the killing. R. 4 at 35. Although the brochure was not distributed to voters in Meade County, local papers quoted it in stories about the gubernatorial race. The campaign flap led the Meade County Attorney to state at the time, "I don't know what's going on in this case. It's kind of turning into a circus with no help from me . . . . This case has taken on a life of its own." R. 2 at 73.

Press coverage of the case diminished after the election. Following the election and Goss's arraignment in early November 1986, no press coverage reoccurred until Goss's second preliminary hearing in February 1987, four months after the crime. Only one article about the hearing appeared in the *Meade Globe Press* (a weekly newspaper), and three appeared in the daily newspaper published in Hutchinson, Kansas. Although primarily factual, one article quoted testimony from the hearing attributing to Goss various jail house statements regarding Janice Amerin, such as "[i]f she doesn't come back to me, I'll kill her," "he'd get

even with her" and he would "bury the bitch." R. 4 at 60–62. In another article, the county attorney was quoted as saying:

> There is something I'd sure like for everyone to know. People seem to be automatically assuming that the trial will be moved elsewhere. The fact is that a potential juror will not be dismissed just because he is familiar with the case. Potential jurors must simply be able to say that they will objectively listen to the evidence and will render a fair and impartial verdict. We could still have this trial right here in Meade County.

R. 4 at 62.

Following this press coverage in February 1987, no further articles about the case were published prior to the trial in October.

In our independent assessment of United States Supreme Court precedent, Goss has not shown that the Kansas Supreme Court's decision was an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d). As we discussed above, it is not enough for a defendant to show "juror exposure to . . . news accounts." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Rather, the defendant must show a "trial atmosphere that had been utterly corrupted by press coverage." *Id.* at 798.

Goss's argument implicates two legally relevant factors: (a) the nature of the publicity and its temporal nexus to the trial, and (b) the effect of the publicity on the potential jury pool. Examining these factors, singularly and collectively, Goss cannot meet this standard.

-19-

## a. Nature of the Publicity and its Temporal Nexus to Trial

Nothing about the press coverage here suggests the corruptive and pervasive media blitz the Supreme Court has required to presume prejudice. First, while the record contains thirty-four newspaper articles about the crime and its aftermath, thirty of those were published between the date of the crime (September 8, 1986) and the first preliminary hearing (November 7, 1986). The remaining four followed the second preliminary hearing on February 16, 1987. Thus, most of the articles pointed to by Goss predated the trial in October 1987 by nearly a year, and all of them predated it by over seven months. [2]

Second, the geographic distribution of the news coverage was dispersed, and Goss, who bears the burden of proof, has failed to show how extensively the newspapers were read or made available in Meade County. Meade County itself had only three newspapers—the *Meade Globe Press*, the *Fowler News*, and the *Plains Journal* —all owned by the same publisher. The publisher distributed a total of four stories following the crime, each of which was reprinted in the three newspapers . While it is likely many Meade County residents subscribed to or read newspapers from larger, nearby cities, absent further evidence in the record, we cannot determine the exposure of residents beyond these four articles.

---

[2] The record also discloses some testimony regarding radio and television coverage of the crime, but Goss provided few details about the nature or extent of the coverage.

Third, the infrequency of local news publication undercuts Goss's claims. Since these newspapers were all weekly publications, they could not have generated "around the clock" news coverage up to and through the trial.

Finally, while the crime certainly generated substantial local attention, the articles were predominately factual and non-inflammatory. The media coverage here contrasts markedly from the facts described in cases such as *Irvin* and *Sheppard*, and "does not reveal the barrage of inflammatory publicity immediately prior to trial" the Supreme Court found crucial to a finding of prejudice. *Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (internal quotations omitted). Indeed, the publicity and trial atmosphere in this case is less extreme than that which attended another notorious murder case in southwestern Kansas in the 1960s; yet that case, involving extensive state and national news coverage, did not warrant a finding of presumed prejudice. *See Hickock v. Crouse*, 334 F.2d 95, 102 (10th Cir. 1964) (applying *Irvin* in a case that involved the murders of four members of a farm family near Garden City, Kansas) (popularized in a novel by Truman Capote, *In Cold Blood* (1965)).

Goss attempts to distinguish his case from those precedents by arguing the trial judge displayed bias against him. But Goss has not demonstrated the stray comment by the trial judge a year before trial about Goss's release on parole in

any way affected the jury pool in general, or any juror in particular. Nor does Goss point to any juror who even mentioned the judge's comment.

Goss also argues that because the case generated statewide interest in the 1986 gubernatorial campaign, the local community could not set aside the prejudice from the pretrial publicity. But, of the fourteen stories describing the campaign brochure and the crime, none was carried by the local Meade County newspapers; and, as noted above, we have no indication of the controversy's level of exposure in Meade County from other media sources. The campaign brochure itself was apparently distributed only in eastern Kansas and not in Meade County. Unsurprisingly, no potential juror referenced the campaign brochure during voir dire.

We thus see no obvious connection between the campaign brochure distributed a year before trial and contemporaneous effects on the jury pool. Goss certainly showed no lingering prejudice from the stories about the gubernatorial race on the trial. In any event, the Supreme Court itself has discounted political controversy arising from a case, noting the trial judge "in the locale where the publicity is said to have had its effect" can gauge "the depth and extent of news stories that might influence a juror." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). Here, the trial court found no improper influence, and this finding is a

factual matter that we must defer to unless manifestly erroneous. *Patton*, 467
U.S. at 1031.

### b. Effect of the Publicity on the Jury Pool

Goss next argues that the demographics of the community made it unable to
set aside its preconceived opinions about his guilt. While the relatively small
population of Plains and Meade County is a factor in assessing pretrial publicity,
the record here points to a community able to supply a sufficient pool of unbiased
potential jurors. As previously explained, community exposure to pretrial
publicity alone is insufficient grounds for a finding of presumed prejudice.
*Murphy*, 421 U.S. at 799. The passage of time before trial—in this case over a
year—also diminishes the presumptive impact of publicity occurring at the time
the crime was committed.

The testimony at the September 1987 hearing on the second motion to
change venue does nothing to dispel this conclusion. More than half of the
witnesses called by Goss stated they believed they could be impartial jurors. And
the trial judge, who observed their testimony and was able to directly assess their
credibility, was satisfied that an impartial jury pool could be found in Meade
County.

Goss contends, however, the trial court should not have accepted the
witnesses' statements of impartiality. But whether particular jurors can be

impartial is a question of fact that we must afford a presumption of correctness. *Patton*, 467 U.S. at 1036–37 & n.12; 28 U.S.C. § 2254(e)(1). To the extent some of the witnesses made equivocal statements regarding their impartiality, the Supreme Court has noted that in highly publicized cases potential jurors often make ambiguous and inconsistent statements regarding partiality due to unfamiliarity with the nature of legal questioning. Such statements in and of themselves do not suggest impermissible partiality. *Patton*, 467 U.S. at 1039. Affording a presumption of correctness to the trial court's conclusions about witness impartiality, we find Goss has failed to show the trial court committed manifest error in crediting the testimony of the witnesses at the hearing on the second motion to change venue.

## 2. Prejudice at Jury Selection

Having found insufficient evidence of presumed prejudice at the time the trial court considered the motions to change venue, a last question remains whether additional evidence developed during jury selection shows that a fair jury could not be seated in Meade County. Goss's argument here breaks into two elements. He contends (a) the testimony of potential jurors during voir dire confirms the prejudicial effect of pretrial publicity, and (b) the actual jurors were improperly exposed to prejudicial comments during jury selection. We disagree.

### a. Testimony of Potential Jurors

Contrary to Goss's claim, a review of the record discloses that a substantial number of potential jurors did not have preconceived opinions about the crime. The court called a total of 120 individuals for voir dire. Of those, eighty-eight were examined by counsel. A total of forty-seven were excused for cause for a variety of reasons, including opinions about the case, a relationship to the victim or her family, medical problems precluding attendance at trial, or connection to the crime investigation. Of those, thirty-five (or 39%) expressed a predisposed opinion of Goss's guilt. While not an insignificant percentage, it is substantially less than the 62% of potential jurors dismissed for cause due to opinions as to the defendant's guilt in *Irvin v. Dowd*, 366 U.S. 717, 727 (1961), and the 77% of potential jurors who said they would carry an opinion as to the defendant's guilt into the jury box in *Patton*, 467 U.S. at 1029. And in *Hale v. Gibson*, 227 F.3d 1298, 1331 (10th Cir. 2000), where we found no prejudice at jury selection, nearly all of the thirty-seven potential jurors had heard about the case from the media, and fully half of the actual jurors possessed a preconceived notion of the defendant's guilt.

After voir dire, of the forty-two remaining potential jurors (whom Goss passed for cause), counsel exercised twenty-eight peremptory challenges, leaving a jury of fourteen jurors and alternates. Goss does not claim he was precluded from examining the jury pool as extensively as he wished or that the jury was

actually biased against him. In fact, the entire jury selection was completed in several hours within the course of a single day. Thus, we cannot conclude the trial court did not seat a fair jury.

### b. Exposure of Jurors to Prejudicial Comments

Goss next contends the voir dire procedure improperly exposed the jury to prejudicial statements by those excused for cause. But nothing in the record shows that the questioning in fact influenced the final twelve jurors or the two alternates. While several potential jurors expressed doubts about their ability to be impartial, none of the comments contained any relevant information about the facts of the murder. Rather, the record shows "voir dire resulted in selecting those who had forgotten or would need to be persuaded again" as to the facts. *Patton*, 467 U.S. at 1032–33. Moreover, "jurors need not be ignorant of the case; in fact, jurors who are completely unaware of such a highly publicized trial would probably not be the best jurors. 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994) (quoting *Irvin*, 366 U.S. at 723).

In any event, Goss never objected to open voir dire, and, even if the process exposed the jury to the opinions of others, Goss, who bears the burden, has made no showing of disqualifying prejudice. The trial court's determination of

-26-

impartiality is entitled to a presumption of correctness and will not be set aside absent "manifest error." *Patton*, 467 U.S. at 1031, 1046–37 & n.12. No such error is apparent here.

Examining the testimony of the jurors actually selected provides further evidence that they had not been tainted. In fact, none of the fourteen jurors and alternates seated in the case expressed a preconceived belief in Goss's guilt or indicated they could not be impartial jurors. Of the fourteen, four suggested potential connections to the case or its participants, but, based on their testimony during voir dire, the court was satisfied they would not be improperly influenced, and no party objected to their seating. One panelist informed the court that, following the murder, he had allowed men working for his road crew to participate in the search for Goss but stated that his impartiality would not be affected by his indirect role in the search, nor had he formed any opinions regarding guilt or innocence. A second panelist stated she knew several potential witnesses but satisfied the court that her acquaintance would not affect her credibility determinations. A third panelist indicated she was married to a former county sheriff but explained that she believed "everyone should deserve a fair trial." R. 15-A at 58. A fourth panelist, who was a sister of a fellow panel member, stated the relationship would not influence her.

An additional two panelists indicated they had read about the case prior to trial but assured the court they would remain impartial. The fifth panelist, when asked whether she had a preconceived notion of the case, responded that if she did, "just being here, I realize you are innocent until proven guilty." R. 15-A at 91. A sixth panelist stated she had heard of the case but had not formed an opinion regarding it.

Panelists seven through twelve gave no suggestion of improper exposure to the facts of the case, and the thirteenth and fourteenth panelists expressed concerns about ability to serve that were entirely unrelated to the particulars of the case (one was to be married soon, and another was concerned about her bottle-fed calves).

Courts have declined to find bias in far more striking circumstances. The Supreme Court found no due process violation in two of its most recent cases examining jury selection: (1) where eight of fourteen jurors held prior opinions about the case, *Patton*, 467 U.S. at 1029–30; and (2) where four of twelve jurors expressed some prejudice against the defendant, *Murphy*, 421 U.S. at 805–06. We recently applied these cases in *Hale*, 227 F.3d at 1331, where six of twelve jurors had actually formed prior opinions about the defendant's guilt. Here, by comparison, only one juror expressed a preconceived opinion regarding Goss—and that juror disavowed bias upon further questioning.

Finally, it is worth noting that Goss accepted the jury, lodging neither an objection as to bias or a motion for mistrial. And the trial court was satisfied that the parties had selected an impartial jury. Questions of jury impartiality are fact questions and can only be overturned "to correct manifest error." *Patton*, 467 U.S. at 1036. No such error exists on this record.

In conclusion, we cannot say that the Kansas Supreme Court unreasonably applied United States Supreme Court precedent. "[E]ven if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively *unreasonable*." *Penry v. Johnson*, 532 U.S. 782, 793 (2001) (emphasis added). Goss cannot make this demanding showing, especially when the Supreme Court has refused to presume prejudice in cases with much more extreme facts than those presented here.

## C. State Court Review

Goss's final argument is that the Kansas Supreme Court opinion was insufficiently comprehensive to suggest meaningful appellate review. We disagree.

In the context of applying 28 U.S.C. § 2254(d), our focus is on whether the *result* reached by the state court contravenes or unreasonably applies clearly established federal law, not on the extent of the reasoning followed by the state

court in reaching its decision. *See Aycox v. Lytle*, 196 F.3d 1174, 1177–78 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated . . . . [W]e cannot grant relief unless the state court's result is legally or factually unreasonable."). Here, the Kansas Supreme Court explained the basis for its ruling, although it did not dwell on all of the factors suggested by United States Supreme Court case law. That explanation meets the standards set forth in AEDPA. Having determined that the result of the Kansas Supreme Court decision does not violate § 2254(d), the lack of a detailed appellate opinion provides no basis for relief.

## V. Conclusion

Based on applicable United States Supreme Court precedent, the Kansas Supreme Court did not unreasonably conclude that Goss received a fair trial. Accordingly, the district court's decision denying habeas relief is AFFIRMED.