**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BIGLER JOBE STOUFFER, II,

      Petitioner - Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

No. 11-6293

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:07-CV-01312-C)**

---

O. Dean Sanderford, Assistant Federal Public Defender, Office of the Federal Public
Defender for the District of Colorado, Denver, Colorado (Virginia L. Grady, Federal
Public Defender, Interim, Office of the Federal Public Defender for the District of
Colorado, Denver, Colorado, and Janet D. Roloff, McAlester, Oklahoma, with him on the
briefs), appearing for Appellant.

Jennifer J. Dickson, Assistant Attorney General of Oklahoma (E. Scott Pruitt, Attorney
General of Oklahoma, with her on the brief), Office of the Attorney General of
Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee.

---

Before **LUCERO, O'BRIEN,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

An Oklahoma state court jury convicted Bigler Jobe "Bud" Stouffer of first degree

murder of one victim and shooting with intent to kill another victim. The jury sentenced

him to death for the murder and to life imprisonment for the shooting.[1]

The Oklahoma Court of Criminal Appeals ("OCCA") affirmed on direct appeal

and denied post-conviction relief. Mr. Stouffer sought habeas relief in federal court

under 28 U.S.C. § 2254, challenging his conviction and death sentence on nine grounds.

The district court denied relief but granted a certificate of appealability ("COA") on four

grounds.[2]

Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253(c)(1)(A), we affirm the

denial of habeas relief on three of the four grounds. We reverse on the ground of jury

tampering and remand to the district court for an evidentiary hearing on this issue.[3]

---

[1] This court vacated Mr. Souffer's convictions on these charges after his first trial because he was denied effective assistance of counsel. *See Stouffer v. Reynolds*, 168 F.3d 1155, 1158 (10th Cir. 1999) (reversing district court's denial of habeas relief); *Stouffer v. Reynolds*, 214 F.3d 1231, 1235 (10th Cir. 2000) (affirming district court's decision to vacate Mr. Stouffer's first conviction). After a second trial, Mr. Stouffer was again convicted on the same two counts and sentenced to death. This appeal arises from the second trial.

[2] A COA is a prerequisite to appellate jurisdiction in a habeas action. *See* 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).

[3] In this case, Mr. Stouffer, the State, and the district court use the term "jury tampering" to refer to Mr. Stouffer's allegation of improper external juror communications about a matter pending before the jury. Courts often use this term to encompass a broad range of conduct, which may or may not involve a deliberate intent to interfere with the jury's decision making. *See, e.g.*, *Remmer v. United States*, 347 U.S.

Continued . . .

## I.  BACKGROUND

### A.  *Factual History*

The OCCA outlined the facts underlying Mr. Stouffer's case, and "[w]e presume that the factual findings of the state court are correct" unless Mr. Stouffer presents clear and convincing evidence otherwise.  *Fairchild v. Workman*, 579 F.3d 1134, 1137 (10th Cir. 2009); *see also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  Mr. Stouffer does not offer clear and convincing evidence that the OCCA's factual conclusions about the crime are erroneous.  We therefore presume them to be correct.

The OCCA found the following events transpired in January 1985:

> Doug Ivens and Velva Ivens . . . were separated and pursuing divorce proceedings.  B.J. (Bud) Stouffer was dating Velva.  Doug Ivens was dating Linda Reaves.
>
> Doug Ivens testified that on January 24, 1985, Stouffer came to his house asking for a pistol.  Stouffer told him that he needed a gun because there were prowlers or a burglar at Velva Ivens's house.  Doug Ivens was concerned for the safety of his estranged wife and his two eight-year-old daughters.

---

Cont.

227, 229 (1954) (jury tampering claim involving attempted bribery of a juror); *Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1021 (10th Cir. 2000) (jury tampering claim involving an exhibit erroneously provided to the jury); *United States v. Sylvester*, 143 F.3d 923, 932 (5th Cir. 1998) (jury tampering claim involving, inter alia, a concession stand vendor at the courthouse who asked the juror to "take it easy on" certain defendants).

Doug Ivens went to his bedroom and came out with a bank bag containing a loaded Colt .357 caliber revolver. Doug gave the bank bag to Stouffer. Stouffer turned his back to Doug Ivens, and then he turned around with the pistol in his hand. Stouffer fired two shots at Ivens, and Ivens fell to the floor. Stouffer then went to where Linda Reaves was reclining on the couch and shot her twice in the head. Stouffer walked back to Ivens and fired another shot into Ivens's face. Stouffer then left.

Ivens was able to crawl to the phone and call the police. He told police that Bud Stouffer had shot him and Linda Reaves. Reaves died as a result of her gunshot wounds, but Doug Ivens survived.

*Stouffer v. Oklahoma*, 147 P.3d 245, 256 (Okla. Crim. App. 2006). Other relevant facts are discussed later in this opinion.

## B. *Procedural History*

Oklahoma charged Mr. Stouffer in state court with First Degree (malice) Murder, Okla. stat. tit. 21, § 701.7(A) (1981), and Shooting with Intent to Kill, *id.* at § 642. A jury convicted him on both counts in 1985. It sentenced him to death for Ms. Reaves's murder and to life imprisonment for shooting Mr. Ivens. *See Stouffer v. Oklahoma*, 738 P.2d 1349, 1352 (Okla. Crim. App. 1987). We granted Mr. Stouffer habeas relief, concluding he was denied effective assistance of counsel. *Stouffer v. Reynolds*, 168 F.3d 1155, 1158 (10th Cir. 1999) (reversing district court's denial of habeas relief); *Stouffer v. Reynolds*, 214 F.3d 1231, 1235 (10th Cir. 2000) (affirming district court's decision to vacate Mr. Stouffer's first conviction).

-4-

The State retried Mr. Stouffer in January and February 2003, and a second jury convicted him on the same two counts. The jury sentenced him to death for Ms. Reaves's murder and to 100 years of imprisonment for shooting Mr. Ivens.[4]

The OCCA affirmed the convictions and sentences on direct appeal. *Stouffer v. Oklahoma*, 147 P.3d at 280. Although it found error or possible error on three grounds, it found all errors harmless. *Id.* at 263-64, 274, 278-280. The OCCA also denied Mr. Stouffer's petition for state post-conviction relief. *Stouffer v. Oklahoma*, No. PCD-2003-835, slip op. at 8 (Okla. Crim. App. Oct. 26, 2007) (unpublished).

Mr. Stouffer then filed a habeas petition with the United States District Court for the Western District of Oklahoma under 28 U.S.C. § 2254, asserting nine grounds for relief. The district court denied relief but granted a COA on four grounds.

## II. DISCUSSION

On appeal, Mr. Stouffer seeks relief on four grounds: (A) jury tampering; (B) prosecutorial misconduct; (C) victim impact testimony; and (D) cumulative error.

### A. *Alleged Jury Tampering*

Mr. Stouffer asserts that he provided the trial court with credible evidence of improper external communication with a juror and that the trial court improperly refused to allow an evidentiary hearing to determine whether the incident caused him prejudice.

---

[4] The State alleged three aggravating circumstances: (1) that Mr. Stouffer had caused a great risk of death to more than one person; (2) that the murder was committed to avoid arrest or prosecution; and (3) that Mr. Stouffer posed a continuing threat to society. The jury found the presence of the first two aggravators, but rejected the third.

We conclude that the trial court erred by not conducting an evidentiary hearing, and we remand to the federal district court with instructions to hold the necessary hearing.

1. **Standard of review**

In a habeas case challenging a state court conviction, "the appropriate standard of review depends upon whether a claim was decided on the merits in state court." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

The OCCA did not address the merits of Mr. Stouffer's jury tampering claim. Mr. Stouffer raised this issue in his petition for state post-conviction relief through his claim that his counsel on direct appeal had been ineffective for failing to raise it. He asked the OCCA for an evidentiary hearing. The OCCA rejected the jury tampering claim, stating that it had addressed the issue on direct appeal and "principles of res judicata . . . barred [Mr. Stouffer] from litigating this issue anew." *Stouffer v. Oklahoma*, No. PCD-2003-835, slip op. at 5 (Okla. Crim. App. Oct. 26, 2007) (unpublished). The parties agree that the OCCA misread the record and that the jury tampering claim was not addressed on direct appeal.

Because the OCCA did not consider the merits of this claim, "our standard of review is more searching" than our review of issues that have been resolved on the merits by the state court. *Alverson v. Workman*, 595 F.3d 1142, 1146 (10th Cir. 2010). We consider legal questions de novo and factual findings, if any, for clear error. *Id.*; *Cannon v. Mullin*, 383 F.3d 1152, 1160 (10th Cir. 2004). We apply an abuse of discretion

-6-

standard in reviewing a trial court's decision whether to hold an evidentiary hearing to investigate alleged jury tampering. *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003).

2. **Legal background**

"In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial, by an impartial jury." U.S. Const. amend. VI. "The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer v. United States*, 347 U.S. 227, 229 (1954) ("*Remmer*"). "Because impartial jurors are the cornerstone of our system of justice and central to the Sixth Amendment's promise of a fair trial, we 'guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.'" *United States v. Dutkel*, 192 F.3d 893, 894 (9th Cir. 1999) (quoting *Remmer v. United States*, 350 U.S. 377, 382 (1956) ("*Remmer II*")).

When confronted with credible evidence of jury tampering, a trial court has a duty to investigate. *See id.* at 899; *Cannon*, 383 F.3d at 1177; *United States v. Bradshaw*, 281 F.3d 278, 289 (1st Cir. 2002); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *United States v. Davis*, 117 F.3d 552, 556-57 (6th Cir. 1999); *United States v. Day*, 830 F.2d 1099, 1103 (10th Cir. 1987). In this context, the term "jury tampering" refers to improper external communication with a juror about a matter pending before the jury. *See, e.g.*, *Remmer*, 347 U.S. at 229; *United States v. Sylvester*, 143 F.3d 923, 932 (5th Cir. 1998). In such cases, "the proper inquiry is whether the unauthorized conduct or contact is potentially prejudicial, not whether the parties alleged to have tampered with

-7-

the jury did so intentionally." *United States v. Rutherford*, 371 F.3d 634, 641-42 (9th Cir. 2004); *see also Gold v. United States*, 352 U.S. 985, 986 (1957).

"When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *Scull*, 321 F.3d at 1280 (quoting *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988)). This evidentiary hearing is often called a "*Remmer* hearing," following the seminal Supreme Court case on the matter. *See Day*, 830 F.2d at 1106. The trial court's duty to conduct a *Remmer* hearing when genuine concerns of improper juror contact arise is clearly established by the Supreme Court. *Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing."); *Remmer*, 347 U.S. at 229-30; *Cannon*, 383 F.3d at 1169-70; *Scull*, 321 F.3d at 1280 & n.5.[5]

---

[5] *Remmer* also established a presumption of prejudice. "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer*, 347 U.S. at 229; *see also Scull*, 321 F.3d at 1280 & n.5; *Silver v. Oklahoma*, 737 P.2d 1221, 1224 (Okla. Crim. App. 1987). "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and a hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer*, 347 U.S. at 229.

Although circuit courts disagree about the contours of the *Remmer* presumption of prejudice, this circuit has continued to follow the presumption "[i]n the absence of Supreme Court authority to the contrary." *Scull*, 321 F.3d at 1280 n.5; *see also Teniente v. Wyo. Atty. Gen.*, 412 F. App'x 96, 102-06 (10th Cir. Jan. 5, 2011) (providing an overview of the circuit split regarding the scope of the *Remmer* presumption).

Continued . . .

Courts have found credible evidence of jury tampering or improper external jury communication in a variety of circumstances, such as a short restroom conversation between a juror and a law enforcement witness that briefly touched on matters tangential to the case, *Day*, 830 F.2d at 1101; a defendant's allegation that a person had approached him to solicit a bribe to sway the jury, *Corrado*, 227 F.3d at 535; and a hearsay report that the father of a witness had improper contact with jurors, *Cannon*, 383 F.3d at 1169.

Yet "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Thus, not every allegation of improper juror contact requires a hearing. For example, a hearing may not be warranted if the defendant provides only speculation that improper juror contact may have occurred. *See, e.g.*, *United States v. Frost*, 125 F.3d 346, 376-77 (6th Cir. 1997) (no hearing required after juror became ill and left jury room to lie down in clerk's office, where there was no evidence juror had external contact during this time). A hearing also may be unnecessary if the communication was not about the matter pending before the jury. *See e.g.*, *United States v. Robertson*, 473 F.3d 1289, 1294-95 (10th Cir. 2007) (no hearing required after juror initiated brief exchange of pleasantries with clerk outside courthouse and there was no discussion about the case).

---

Cont.

The *Remmer* presumption of prejudice does not apply, however, in a collateral review when the state court held an evidentiary hearing and the state's highest court reviewed the claim on its merits and made factual findings. *See Malicoat v. Mullin*, 426 F.3d 1241, 1250 (10th Cir. 2005); *Cannon*, 383 F.3d at 1170.

Finally, a hearing may be unnecessary if "the challenged statement is both ambiguous and innocuous" or when there is no evidence any juror actually heard or saw it. *Brown v. Finnan*, 598 F.3d 416, 420-23 (7th Cir. 2010) (no hearing required after victim's mother proclaimed from the gallery that "the situation is racist," because the victim and the accused were of the same race and the statement was therefore ambiguous, and because there was no evidence the jury heard it); *cf. Malicoat v. Mullin*, 426 F.3d 1241, 1246, 1247 (10th Cir. 2005) (no hearing was required to investigate whether jurors were influenced by an inscription on the courtroom wall that read "eye for an eye and a tooth for a tooth," in part because there was "no evidence that the jury could see the inscription given its vantage point").

### 3. **Improper juror communication**

Toward the end of the penalty stage of Mr. Stouffer's second trial, defense counsel noticed the husband of Juror Stacey Vetter in the courtroom. Mr. Vetter was "laughing, joking, handshaking, and embracing" with a former roommate of shooting victim Doug Ivens. 2nd Stage Tr. Vol. IV at 605.[6] The roommate was sitting with Mr. Ivens's family. According to the prosecutor, the roommate knew that Mr. Vetter's wife was a juror. Defense counsel approached Mr. Vetter and asked him about his relationship with Mr. Ivens's family and friends. Mr. Vetter responded that he had met them about thirty minutes earlier. As soon as defense counsel turned away, Mr. Vetter "disappeared out of

---

[6] All references to the trial transcript refer to Mr. Stouffer's second trial in 2003.

the courtroom," *id*. at 607, and an assistant attorney general watched him "scoot[] to the elevator," *id*. at 615.

When proceedings resumed, defense counsel informed the court of Mr. Vetter's presence and activity in the courtroom and asked to question the Vetters as to whether they had communicated about the case. The prosecutor conceded it was appropriate to question Mr. Vetter and the roommate, and the trial court agreed to allow it. The attorneys discovered, however, that both men had left the building immediately after defense counsel had spoken with Mr. Vetter. Defense counsel then suggested taking testimony from another individual who had observed Mr. Vetter in the courtroom— Deputy Boles, the sheriff's deputy responsible for escorting Mr. Stouffer during the trial.

Deputy Boles testified in camera and under oath that he had been present throughout the trial and had observed repeated non-verbal communication between Juror Vetter and her husband. The deputy saw Mr. Vetter repeatedly nod and wink at Juror Vetter throughout the penalty stage testimony and closing arguments. At one point during the prosecution's final closing argument, Juror Vetter looked to her husband with "a questioned look in her face." *Id*. at 608. Mr. Vetter responded by nodding and rolling his eyes.

The deputy attempted to testify that this and other exchanges between the Vetters occurred in response to particular statements by the prosecution that Deputy Boles described as "good points," and that Mr. Vetter expressed agreement with the prosecutor. *Id*. at 609, 612-13. The trial court stopped this testimony, saying that it was speculative

and thus inadmissible.[7] The prosecutor interceded, telling the court "I don't have a problem. They have got to make a record here. This [is about the] deputy's perspective. He's a human being. He ought to be able to offer his opinion." *Id*. at 613. The court relented and permitted limited testimony from the deputy.

Deputy Boles then testified that when Juror Vetter had given her husband the questioned look, it was in response to a "strong point" by the prosecutor. *Id.* at 613. From the deputy's perception, the communication between the Vetters expressed agreement with the prosecution and indicated to the deputy that Mr. Stouffer was "screwed." *Id*. at 614.

In response to this testimony, the defense asked for a mistrial or alternatively to conduct "further inquiry," *id*. at 615, or to "cross examine" Juror Vetter, *id*. at 622. The trial court denied the motion for mistrial and failed to respond to the alternative requests for more investigation into the Vetters' communication. The trial court concluded that the defense had produced nothing more than "a lot of speculation." *Id*. at 615. The court seemed to confine its analysis to whether Deputy Boles's testimony proved that Juror Vetter had spoken with her husband about the case outside the courtroom. The court did not say clearly whether the non-verbal communication in the courtroom during proceedings constituted improper juror contact.

_____

[7] The trial court found the deputy's testimony speculative on two fronts. First, it said the deputy could not characterize prosecution statements as being "good points." 2nd Stage Tr. Vol. IV at 609. Second, it said that the deputy could not testify as to the apparent meaning of the Vetters' non-verbal communications.

-12-

4. **The trial court failed to adequately investigate improper juror communication**

The state trial court and the OCCA failed to adequately investigate and make specific factual findings about the substance or circumstances of the Vetters' challenged communication. Neither the State nor the trial court has questioned the truthfulness or accuracy of Deputy Boles's testimony or of defense counsel's observations of Mr. Vetter's other courtroom behavior. But the parties dispute whether the communications were improper, whether they prejudiced Mr. Stouffer, and whether they were harmless. We address each of these questions in turn.

a. *The Vetters' courtroom communications were improper*

The evidence from the deputy's testimony and defense counsel's observations showed that (1) the Vetters walked into the courtroom together; (2) Mr. Vetter introduced himself to Mr. Ivens's family and friends as the spouse of a juror and then embraced, laughed, and joked with Mr. Ivens's roommate in the courtroom in the presence of the jury; (3) Mr. Vetter communicated non-verbally with Juror Vetter during the penalty stage and throughout the attorneys' closing arguments; (4) Juror Vetter looked to Mr. Vetter "with a questioned look on her face" after the prosecution made a particular argument, *id.* at 608; and (5) the Vetters' non-verbal exchanges appeared to convey opinions about the attorneys' arguments.[8]

---

[8] Deputy Boles testified that the Vetters' communication appeared supportive of prosecution statements. The trial court apparently discounted portions of his testimony

Continued . . .

-13-

The trial court concluded that Deputy Boles's testimony and the observations of defense counsel were not credible evidence of improper juror communication but instead constituted only "speculation" of improper communication. *Id.* at 615. The court therefore refused to investigate further. Although the prosecutor supported defense counsel's request for a hearing, the State now argues the record is sufficient to show the communications were "ambiguous and innocuous," *Brown*, 598 F.3d at 420-21, and Deputy Boles's testimony merely raised speculation that the Vetters had improperly communicated about the case. We disagree.

Both the State and the trial court erroneously ignore that the Vetters' repeated non-verbal communications—which occurred inside the courtroom, during proceedings, and apparently concerned the attorneys' closing arguments—were themselves improper. Although some ambiguity may be inherent in non-verbal communications, the timing and context of the Vetters' non-verbal communications and the deputy's specific observations

---

Cont.

that concerned the meaning of these non-verbal communications, referring to the deputy's perceptions as speculative. The State also urges us to ignore these perceptions.

Oklahoma's rules of evidence provide that a non-expert witness may testify concerning opinions that are "[r]ationally based on the perception of the witness," "[h]elpful to a clear understanding of . . . a fact in issue," and "[n]ot based on scientific, technical, or other specialized knowledge." Okla. Stat. tit. 12, § 2701; *see also Welch v. Oklahoma*, 2 P.3d 356, 368 (Okla. Crim. App. 2000). The Vetters exchanged nods, winks, eye rolls, and other gestures and expressions. A firsthand witness to such non-verbal exchanges would likely have useful insight about their meaning and tone that a third party could not understand from the bare factual description—e.g., that Mr. Vetter nodded. The deputy's perceptions were therefore relevant and admissible and should be considered.

-14-

strongly indicate they were discussing matters pending before the jury. This is improper juror communication, and the state trial court erred in failing to allow a hearing to investigate it. *See Remmer*, 347 U.S. at 229.

        b. *The existing record is inadequate to resolve whether Mr. Stouffer was prejudiced*

The State argues that no hearing is needed because the existing record is sufficient for us to conclude that Mr. Vetter's communications with Juror Vetter did not prejudice Mr. Stouffer. We disagree.

First, the State contends that Mr. Stouffer was not prejudiced because Deputy Boles testified that Mr. Vetter acknowledged strong points by both lawyers. The State takes this to mean that the Vetters' communication did not favor either side. We have carefully reviewed the transcript of this testimony and find the State's characterization implausible.

Although some portions of Deputy Boles's testimony are ambiguous regarding the meaning and tone of the Vetters' communication, this is in large part because the trial court initially prevented the deputy from describing his impressions about whether the Vetters' exchanges were favorable or unfavorable to Mr. Stouffer. When he was permitted to describe his impressions, the deputy plainly testified that, after witnessing the Vetters' communications during the prosecution's remarks, his impression was that Mr. Stouffer was "screwed." 2nd Stage Tr. Vol. IV at 614. Although the deputy did acknowledge that Mr. Vetter may have grinned at some point during defense counsel's

-15-

remarks, his testimony cannot be reasonably understood to indicate that Mr. Vetter's expressions to Juror Vetter were somehow neutral or equally supportive of both sides.

Second, at oral argument, the State also argued that no hearing was necessary because Juror Vetter had previously confirmed that she understood her duty not to communicate with her husband about the case. During an in camera hearing earlier in the penalty stage trial, Juror Vetter acknowledged to the court that Mr. Vetter had attempted to talk to her about a newspaper article about the trial. At the time, Juror Vetter assured the court she had refused to talk about the case and that her husband's attempt to talk with her would not affect her deliberations.

This incident undermines the State's argument. Although it suggests that Juror Vetter knew she was not permitted to discuss the case with her husband, it also reveals that Mr. Vetter's courtroom behavior during closing arguments was not his first attempt to communicate improperly with his wife about the case. Moreover, Juror Vetter's participation in improper non-verbal communication with her husband during the proceedings raises a question whether she genuinely understood—or even chose to disregard—her duty to refrain from discussing the case with her husband.[9]

---

[9] In addition to his jury tampering claim, Mr. Stouffer's original habeas petition raised concerns about Juror Vetter's voir dire responses. In Ground One, Mr. Stouffer alleged misconduct by three jurors, including Juror Vetter. He contended that Juror Vetter misled the court by failing to disclose previous arrests when asked about past contacts with the justice system. The OCCA rejected this claim on its merits, finding that Mr. Stouffer had not shown that Juror Vetter was biased. The federal district court denied relief, concluding that the OCCA's finding of no bias was a factual determination

Continued . . .

In sum, the State's arguments about the record and prejudice lack merit. Indeed,

the second argument reinforces the view that the deputy's testimony constituted credible

evidence of improper juror communication. The "proper remedy" was to conduct a

*Remmer* hearing "to determine . . . the extent of the prejudice, if any, to the defendant."

*Scull*, 321 F.3d at 1280 (quotations omitted). The trial court abused its discretion by

failing to investigate this communication adequately. This failure prevented that court—

and now prevents this court—from reasonably determining whether Mr. Stouffer was

prejudiced.

      c. *Harmlessness cannot be determined without a hearing*

The State alternatively argues that even if the improper communication caused

prejudice to Mr. Stouffer, it was harmless because the evidence against Mr. Stouffer was

_____

Cont.

entitled to a presumption of correctness under the deferential AEDPA review standard
described later in this opinion.

      In Ground Two of his habeas petition, Mr. Stouffer argued that three jurors,
including Juror Vetter, should have been removed for cause. He alleged that Juror Vetter
was biased by her extensive family connections to law enforcement—including Mr.
Vetter, who had worked on the district attorney's election campaign and loaned trucks to
the police department for undercover operations. In addition, Juror Vetter disclosed that
she and Mr. Vetter personally knew and attended church with the district attorney and
that her father-in-law and brother-in-law were career law enforcement officers. The
OCCA rejected this claim on its merits, concluding there was no indication of bias
because the jurors all stated they would follow the law. The federal district court denied
relief, concluding this factual finding survived AEDPA review.

      A COA was not granted on these two grounds, and they are therefore not at issue
on appeal. But the underlying facts are part of the record and provide relevant context to
our consideration of the jury tampering claim before us. These facts tend to corroborate
the concerns about the improper juror communication.

overwhelming.  The federal district court agreed.

The incidents of improper communication in the record occurred during the penalty stage.  The State presented extensive aggravating evidence, and it is therefore possible that the Vetters' improper communication was harmless.  But given the trial court's failure to adequately investigate, the federal district court could not have reasonably concluded whether the improper communication was harmless without first determining the existence and extent of the prejudice.  This required a hearing to uncover the facts and circumstances of the contact, including the substance and extent of Juror Vetter's communication with her husband about the case, whether other jurors were aware of this communication, and whether they influenced her decision or other jurors' decisions about Mr. Stouffer's sentence.  *See Remmer*, 347 U.S. at 229-30; *Scull*, 321 F.3d at 1280; *Corrado*, 227 F.3d at 536.

The federal district court therefore erred in conducting a harmlessness analysis without holding an evidentiary hearing.[10]

5.  **Mr. Stouffer is entitled to a hearing in federal court**

Having concluded the state trial court abused its discretion by failing to allow a *Remmer* hearing and that the federal district court likewise erred in conducting a harmlessness analysis without holding a hearing, we must now determine whether Mr.

---

[10] Neither the state trial court nor the OCCA conducted a harmlessness analysis. The state trial court did not reach the question of harmlessness because it failed to find credible evidence of improper juror communication, and the OCCA did not reach the question because it did not address the merits of the jury tampering claim.

Stouffer may receive a hearing in federal court. We first consider whether Mr. Stouffer satisfies the diligence requirement outlined in 28 U.S.C. § 2254 and conclude that he does. We then examine and reject the State's procedural arguments against granting an evidentiary hearing.

a. *Mr. Stouffer satisfies § 2254's diligence requirement*

Because the trial court failed to provide the proper remedy, we must determine whether a federal court may do so. Federal law "restrict[s] the authority of federal courts to grant evidentiary hearings in habeas cases." *Cannon*, 383 F.3d at 1175. Mr. Stouffer cannot receive a hearing if he "failed to develop the factual basis of [his] claim" in state court, 28 U.S.C. § 2254(e)(2), due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). To demonstrate the required diligence, Mr. Stouffer must show that he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court" in "the manner prescribed by state law." *Id.* at 435, 437.

Mr. Stouffer's counsel asked the trial court for a hearing to examine Mr. Vetter and Juror Vetter, and the court refused. As the State concedes, he raised the issue in his state application for post-conviction relief (along with a claim that counsel on direct appeal had been ineffective for failing to raise it). And he asked both the federal district court and this court to consider the request. This is sufficient to satisfy § 2254(e)'s diligence requirement.

-19-

b. *The request for an evidentiary hearing is not procedurally barred and is within our jurisdiction*

The State makes several procedural and jurisdictional arguments against granting an evidentiary hearing. It first argues that Mr. Stouffer waived the request for an evidentiary hearing because his original federal habeas petition sought a different remedy—vacation of his conviction—rather than an evidentiary hearing.[11] However, Mr. Stouffer filed a pro se motion alternatively requesting an evidentiary hearing on the matter. Although the district court had discretion to refuse to consider a pro se motion filed by a represented party, *see United States v. Bennett*, 539 F.2d 45, 49-50 (10th Cir. 1976), it did not do so in this case. To the contrary, the district court considered multiple pro se motions from Mr. Stouffer. Thus, even if the request for evidentiary hearing would have otherwise been waived, we conclude that it was fairly raised before the district court.

The State next argues that we lack jurisdiction to consider this issue because the district court's COA did not mention an evidentiary hearing. But a COA was granted for the jury tampering claim, and a *Remmer* hearing is "the proper remedy . . . to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *Scull*, 321 F.3d at 1281 (emphasis added) (quotations omitted). This is sufficient to establish our appellate jurisdiction over whether there should be an

---

[11] On appeal, Mr. Stouffer abandons his request for immediate vacation of his conviction and instead seeks an evidentiary hearing to determine whether he was prejudiced by the improper juror communication.

evidentiary hearing on this issue.

Finally, the State argues that we lack authority to grant an evidentiary hearing because a *Remmer* hearing is a criminal procedure rule, not a constitutional right, and is therefore outside federal jurisdiction. This argument fails for the same reason the jurisdictional argument fails: the alleged Sixth Amendment constitutional violation is jury tampering. The proper remedy for this violation is an evidentiary hearing. *See id.* This court has the authority to decide the appropriate remedy if we determine a constitutional violation has occurred. *See, e.g.*, *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) (granting evidentiary hearing in federal court on petitioner's claim for ineffective assistance of counsel, where COA was granted on the ineffective assistance claim but denied on the "ancillary matter of an evidentiary hearing," Certificate of Appealability, *Littlejohn v. Workman*, No. CIV-05-225-M, slip op. (W.D. Okla. July 6, 2010) (unpublished)).

In short, we find no jurisdictional or procedural bar to our granting a federal evidentiary hearing.[12]

---

[12] In district court, the State also argued that Mr. Stouffer's jury tampering claim was procedurally barred for failure to exhaust his state court remedies because the OCCA did not consider the issue on its merits. The district court correctly concluded that the Supreme Court's decision in *Cone v. Bell*, 556 U.S. 449, 465 (2009), forecloses this argument.

*Cone* involved procedural facts similar to this case: a state court erroneously barred a petitioner's claim on res judicata grounds even though the petitioner had not previously raised the claim. *Id.* at 464, 466. As in Mr. Stouffer's case, because the state court had relied on res judicata, it did not decide whether the petitioner had complied

Continued . . .

*    *    *

We reverse the federal district court's denial of relief on this issue and remand to conduct a *Remmer* hearing consistent with this opinion.

B. *Prosecutorial Misconduct*

Mr. Stouffer objects to several statements the prosecutor made at trial as amounting to prosecutorial misconduct and warranting reversal of his conviction. We affirm denial of relief on this basis.

1. **Standard of review**

The OCCA considered the merits of this claim. Our review is therefore governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which requires us to defer to the OCCA's conclusion unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

"This highly deferential standard for evaluating state-court rulings demands that

---

Cont.

with state procedural laws. *See id.* The *Cone* Court held that the petitioner had properly preserved and exhausted the claim and that no procedural bar prevented it from being heard in federal court. *Id.* at 466; *see also Yist v. Nunnemaker*, 501 U.S. 797, 804 n.3 (1991)). The *Cone* Court also held that the claim was not procedurally defaulted because the state's dismissal of the claim on erroneous grounds was not an "independent and adequate" state ground. *Cone*, 556 U.S. at 466-69.

-22-

state-court decisions be given the benefit of the doubt." *Hooks v. Workman*, 689 F.3d 1148, 1162-63 (10th Cir. 2012) (quotations omitted). An application of Supreme Court law may be incorrect without being unreasonable. *Williams v. Taylor*, 529 U.S. 362, 410 (2000); *see also Richter*, 131 S. Ct. at 786 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). We may reverse only if all "fairminded jurists" would agree that the state court got it wrong. *Richter*, 131 S. Ct. at 786.

In contrast to the deference granted to the OCCA, "we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error." *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002).

2. **Legal background**

It is improper for a prosecutor to "encourage[e] the jury to allow sympathy to influence its decision." *Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999). Although "[s]ome emotion is inevitable in capital sentencing," a jury's decision must be based on the facts and the evidence. *Id.* (quotations omitted). It is also improper for a prosecutor to misstate the evidence or the law or to engage in personal attacks on defense counsel or the defendant. *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002); *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001).

Allegations of prosecutorial misconduct are reviewed under a due process analysis. *See Le*, 311 F.3d at 1013. Courts must examine alleged misconduct in the context of "the entire proceeding, including the strength of the evidence against the

petitioner" in both stages of a capital trial. *Wilson v. Sirmons*, 536 F.3d 1064, 1117 (10th

Cir. 2008) (quotations omitted). "The ultimate question is whether the jury was able to

fairly judge the evidence in light of the prosecutors' conduct." *Id.* (quotations omitted).

A prosecutor's improper statement is reversible only if it "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Darden v.

Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S.

637, 643 (1974)); *see also Le*, 311 F.3d at 1013 (asking whether the jury was able "to

judge the evidence fairly in light of the prosecutor's conduct").

3. **Challenged statements**

Mr. Stouffer challenges eight statements by the prosecutor during the guilt stage,

mostly made during closing argument.[13] We address the challenged statements in the

---

[13] Mr. Stouffer's opening brief alleges two new claims of prosecutorial misconduct that were not part of his § 2254 habeas petition. First, he points to the prosecutor's repeated references to unrelated high profile murder cases. On direct appeal, Mr. Stouffer challenged these references as improper opinion testimony, but the OCCA considered them "more akin to prosecutorial misconduct." *Stouffer v. Oklahoma*, 147 P.3d at 267. The OCCA found the references "extremely improper and irrelevant," but it concluded that they did not affect the outcome of the trial. *Id.* Mr. Stouffer did not include the references to the unrelated murder cases in his habeas petition. We do not generally consider issues that were not raised before the district court as part of the habeas petition. *See Parker v. Scott*, 394 F.3d 1302, 1327 (10th Cir. 2005).

Mr. Stouffer's second new prosecutorial misconduct allegation is that the prosecutor interfered with his right to testify by threatening to present false witness testimony that he conspired to have a hit man kill Mr. Ivens to prevent Mr. Ivens's testimony at the second trial. This allegation is duplicative of Ground Four in Mr. Stouffer's § 2254 habeas petition, in which he claimed deprivation of his constitutional right to testify on his own behalf. The district court rejected Ground Four and refused to grant a COA on that claim. Mr. Stouffer's attempt to restyle the allegation as a new

Continued . . .

order presented in Mr. Stouffer's brief.[14]

a. *Statement 1: The gloves*

During the guilt stage of the trial, the jury learned that police had not found Mr. Stouffer's fingerprints at the crime scene. To explain this, the prosecution offered Mr. Ivens's testimony that Mr. Stouffer was wearing gloves during the shooting and Velva Ivens's testimony that Mr. Stouffer kept brown gloves in his coat pockets. But police never found the gloves, and the State was unable to produce them at trial. The prosecutor theorized that Mr. Stouffer had surreptitiously disposed of the gloves after his arrest when junior officers let him use the bathroom unattended. He introduced this theory through questions posed to Officer Neaves, a law enforcement witness.

Mr. Stouffer contends that the prosecutor's questions to Officer Neaves improperly and incorrectly implied that law enforcement witnesses had seen Mr. Stouffer with the gloves after his arrest, even though Officer Neaves actually testified that he did

_____

Cont.

prosecutorial misconduct claim is procedurally improper because (1) it was not raised before the district court as part of the habeas petition , *see Parker*, 394 F.3d at 1327, and (2) no COA has been granted on the new claim, *Miller-El*, 537 U.S. at 335-36.

[14] Defense counsel failed to object at trial to four of the eight challenged statements—including statement 2, 3, 4, and 6. The OCCA therefore evaluated these statements under Oklahoma's plain error standard—a more deferential review that allows reversal only if the error "goes to the foundation of the case, or . . . takes from a defendant a right essential to his defense." *Stouffer v. Oklahoma*, 147 P.3d at 265 (quotations omitted). We do not consider the impact of the OCCA's plain error review on these statements because we conclude the OCCA's conclusions survive AEDPA deference irrespective of plain error.

not recall Mr. Stouffer having gloves on. The OCCA determined that the inference underlying the State's theory—that Mr. Stouffer had disposed of the gloves in the bathroom after his arrest—was "properly based on the evidence and the circumstances surrounding the arrest or apprehension of" Mr. Stouffer. *Stouffer v. Oklahoma*, 147 P.3d at 275.

Our review of the transcript suggests the prosecutor's questioning was confusing and that an inattentive juror could have incorrectly believed Officer Neaves or another officer had seen the gloves. But earlier evidence supported the prosecutor's theory that Mr. Stouffer had worn gloves during the murder and later disposed of them. We cannot say this questioning infected the trial with unfairness or prevented the jury from fairly judging the evidence. The OCCA's conclusion that it was permissible therefore survives AEDPA review.

b. *Statement 2: Description of Ms. Reaves*

During closing arguments in the guilt stage, the prosecutor described the moment Mr. Stouffer shot Ms. Reaves using highly emotional language: "Linda screaming, 'no.' . . . The woman that Doug Ivens loves screams, Dana Wheat's sister, [her] last words, 'no.'" 1st Stage Tr. Vol. XIII at 105. We agree with the OCCA that this was an inappropriate "attempt to elicit an emotional response." *Stouffer v. Oklahoma*, 147 P.3d at 275. But Mr. Stouffer has not shown that it was prejudicial in the context of the entire trial or that it prevented the jury from fairly judging the evidence. *See Donnelly*, 416 U.S. at 643; *Wilson v. Sirmons*, 536 F.3d at 1117.

-26-

The State presented overwhelming evidence of guilt, including Mr. Ivens's testimony as a surviving witness, a recording of his 911 call placed immediately after the crimes, and Ms. Ivens's testimony that Mr. Stouffer confessed to her after his crimes. Given these circumstances, it is unlikely this comment left the jury unable to fairly judge the evidence. The OCCA's conclusion that this comment did not deprive Mr. Stouffer of a fair trial survives AEDPA review.

c. *Statement 3: Officer has "nightmares in his eyes"*

During the same guilt stage closing arguments, the prosecutor told the jury that Officer Gibbons has "nightmares about this, you can see the nightmares in his eyes. He smells and he sees Linda [Reaves] now. . . . He sees her now." 1st Stage Tr. Vol. XIII at 106. Mr. Stouffer argues this comment was improper and without basis in evidence because Officer Gibbons did not testify to having nightmares or to seeing or smelling Ms. Reaves.

The OCCA found the comment was "calculated to elicit an emotional response" and was therefore improper, but it also acknowledged that previous testimony had shown that the crime had emotionally affected the officer. *Stouffer v. Oklahoma*, 147 P.3d at 275. The OCCA concluded the improper comments "did not affect the jury's finding of guilt." *Id.* This conclusion was reasonable and survives AEDPA review.

d. *Statement 4: "Why doesn't he just die"*

During guilt stage closing arguments, the prosecutor told the jury that another police officer, Officer Aaron, had aged "from what we make these folks see and what

-27-

they saw when they came in that night, what you've now been cursed with, charged with. Doug is trying to get up. Incredibly[,] Doug is trying to get up. Golly, why doesn't he just die?" 1st Stage Tr. Vol. XIII at 106.

The OCCA understood the latter part of this statement as a proper argument "that Stouffer shot Ivens with the intent to kill" but determined that the speculation about how it affected the officer was improper. *Stouffer v. Oklahoma*, 147 P.3d at 275. Nevertheless, the OCCA again found the comments did not deprive Mr. Stouffer of a fair trial.

We agree the prosecutor should not have commented on the officer's emotional state. But in the context of the trial as a whole, there is no indication this caused Mr. Stouffer prejudice or deprived him of a fair trial. The OCCA's decision therefore survives AEDPA review.

e. *Statement 5: Ms. Reaves's "left eye following" Mr. Stouffer*

Again during guilt stage closing arguments, the prosecutor described Mr. Stouffer's alleged actions during the crime: "He walks back up and he takes this hand – you remember the police describe Linda is still breathing. She is still breathing. . . . [T]hink about what this says about Bud Stouffer. Her eye followed Bud Stouffer walking across the room just like it followed the officers and the EMT." 1st Stage Tr. Vol. XIII at 107.

This statement referred to earlier testimony by a law enforcement officer who arrived at the scene about an hour after Ms. Reaves had been shot. The officer testified

that he found Ms. Reaves breathing and that her left eye was moving and seemed to follow him as he traveled around the room. In the challenged statement, the prosecutor referred to this testimony and suggested that Mr. Stouffer would also have seen Ms. Reaves's eye moving. The prosecutor went on to argue that Mr. Stouffer's actions "staging" the crime scene and his calm demeanor at his arrest revealed his state of mind.

Defense counsel objected to this prosecution statement, but the trial court overruled the objection, saying the statement was a proper comment about Mr. Stouffer's state of mind and was based on the evidence. *Stouffer v. Oklahoma*, 147 P.3d at 276. The OCCA concluded that the prosecutor drew a fair inference from previous testimony that Ms. Reaves's left eye had followed Mr. Stouffer. The OCCA further concluded that this argument was relevant to Mr. Stouffer's state of mind at the time of the killing. It therefore held that the trial court did not abuse its discretion by overruling the objection.

We agree. Like the prosecutor's questions about the gloves, this inference was grounded in earlier testimony and was relevant to an element of the crime—in this instance, Mr. Stouffer's state of mind. The OCCA's conclusion was reasonable and therefore survives AEDPA review.

f. *Statement 6: "Cold-blooded"*

In his guilt stage closing arguments, the prosecutor described Mr. Stouffer as "cold-blooded" and "stone cold-blooded" and said the defendant had ice water in his veins. 1st Stage Tr. Vol. XIII at 105, 108, 124. The OCCA determined that the characterization was supported by the evidence. Although the OCCA did not expressly

-29-

say it, these descriptions of Mr. Stouffer's actions also were arguably characterizations of his mental state, which was relevant to the jury's decisions in both stages of trial. The OCCA's conclusion was reasonable and therefore survives AEDPA review.

g. *Statement 7: "Bounced a check"*

During guilt stage closing arguments, the prosecutor said, apparently speaking metaphorically, that Mr. Stouffer had written a "bad check" or a "bounced check" by failing to prove his factual claims about "what led up to [the] altercation." 1st Stage Tr. Vol. XIII at 132. As part of this argument, the prosecutor implied that the State did not have the burden to disprove the absence of self-defense. Defense counsel objected. The trial court sustained the objection and admonished the jury that the State, and not the defense, carried the burden of proof in the case.

The OCCA determined that, to the extent the prosecutor's metaphor suggested that counsel and the defendant had not "live[d] up to their word," the statement was an improper personal attack on defense counsel. *Stouffer v. Oklahoma*, 147 P.3d at 277.[15] But the OCCA found no prejudice to Mr. Stouffer. The OCCA also concluded—even though the trial court had sustained defense counsel's objection—that the prosecution's reference to the burden of proof was appropriate because it merely pointed out the lack of evidence supporting Mr. Stouffer's self-defense claim. The OCCA held that any error

---

[15] The OCCA's interpretation of the prosecutor's statement is a factual matter and receives AEDPA deference. We note, however, that the statement is easily susceptible to a less objectionable reading—an argument that defense counsel had not presented evidence to support the self-defense theory and that the State had disproved the theory.

was not reversible.

Although the part of this statement about self-defense could have misled the jury about the burden of proof, the state trial court alleviated this concern when it admonished the jury that the State carried the burden of proving the absence of self-defense. On appeal, Mr. Stouffer does not dispute the federal district court's finding that the prosecutor's subsequent references to his self-defense theory correctly and clearly noted that the State carried the burden. Thus, the OCCA's conclusions—that the trial court's ruling was correct and that the personal attack on defense counsel was not prejudicial—survive AEDPA deference.

   h. *Statement 8: Ms. Reaves's "left eye following" Officer Gibbons*

When examining Officer Gibbons, the prosecutor said, "you mentioned [Linda Reaves] breathing. There was something else you saw, though, too that led you to believe that she was still alive." 1st Stage Tr. Vol. VIII at 121. The officer responded that he had seen Ms. Reaves's left eye following him when he moved around the room. At the time, he assumed she was conscious and found this "frightening." *Id*.[16] Officer Gibbons testified that the apparent murder weapon, a pistol, was resting near Ms. Reaves's body. Because he believed she was alive and conscious, he chose to move the weapon away from her for safety purposes.

_____

[16] As the prosecutor later told the jury, the autopsy had determined conclusively that Ms. Reaves had not been conscious at this time and that her eye movements were merely an "automatic" response. 1st Stage Tr. Vol. VIII at 121.

The OCCA determined the questions and comments were appropriate and relevant because they explained why the officers at the scene chose to move the pistol and showed the jury "there were no ulterior motives in changing the scene of the crime." *Stouffer v. Oklahoma*, 147 P.3d at 278.

The prosecutor's question may not have been phrased correctly, but it elicited relevant testimony that explained why the officers had moved the pistol when they arrived at the crime scene. Mr. Stouffer has not pointed to any Supreme Court precedent indicating this statement was improper. The OCCA's conclusion therefore survives AEDPA review.

i. *Cumulative effect*

The OCCA deemed four of the eight challenged statements—statements 2, 3, 4, and 7—to be improper but not individually prejudicial. The OCCA further concluded that "the cumulative effect of all of this misconduct is not sufficient to warrant reversal in this case." *Id.* at 278. We agree.

Three of the improper statements involved an inappropriate appeal to emotion. "This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision." *Moore*, 195 F.3d at 1172. Even so, "[s]ome emotion is inevitable in capital sentencing." *Id.* Many sources of intense emotion were present in this trial, including: testimony from the surviving witness of the crime, his almost-fatal injuries, and his long recovery; the audio recording of Mr. Ivens's 911 call, describing the crime in the heat of the moment, just after he had been shot and crawled to the phone;

-32-

testimony from law enforcement officials about the grisly scene; and Ms. Reaves's fatal head injury. By comparison, the challenged comments were brief and relatively mild. *See Hooper v. Mullin*, 314 F.3d 1162, 1173 (10th Cir. 2002); *cf. Lockett v. Trammell*, 711 F.3d 1218, 1238-39 (10th Cir. 2013) (evaluating harmlessness of improper victim impact statement in part based on its emotional impact on the jury in the context of other emotional evidence and testimony).

The trial court instructed the jury to make its decision based on the evidence and not to be influenced by sympathy. "These instructions, which the jury presumably followed, helped to mitigate the effect on the jury of any possible improper prosecutorial statements." *Moore*, 195 F.3d at 1173. Mr. Stouffer has not pointed to, and we have not found, any Supreme Court case that would require a finding of prejudice in these circumstances, nor could the OCCA's cumulative error decision be deemed an unreasonable determination of fact. Thus, the OCCA's conclusion that these statements were not cumulatively prejudicial and did not infect the trial with unfairness survives AEDPA deference.

* * *

In short, we conclude that Mr. Stouffer is not entitled to relief on his federal habeas claim for prosecutorial misconduct.

## C. *Victim Impact Testimony*

Mr. Stouffer argues that the victim impact testimony presented at his trial was unconstitutional and prejudicial. We affirm denial of relief on this basis.

-33-

1. **Standard of review**

Because the OCCA considered the merits of this claim, AEDPA governs our review. We reject the OCCA's merits conclusion only if it is "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Harrington*, 131 S. Ct. at 785.

2. **Legal background**

The Eighth and Fourteenth Amendments limit the prosecution's ability to present evidence about a crime's impact on victims. As explained below, the Eighth Amendment bars particular types of highly prejudicial victim impact evidence, while the Fourteenth Amendment bars victim impact evidence that is so emotionally charged or otherwise prejudicial as to deprive the defendant of due process of law.

a. *Eighth Amendment*

The Eighth Amendment bars specific types of victim impact statements. *See Lockett*, 711 F.3d at 1235. Specifically, the victim's family may not offer opinions about the crime or the defendants and may not offer sentencing recommendations to the jury. *See id.* (discussing Supreme Court precedent, including *Booth v. Maryland*, 482 U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991)); *Selsor v. Workman*, 644 F.3d 984, 1026-27 (10th Cir. 2011); *Hooper*, 314 F.3d at 1174; *Hain v. Gibson*, 287 F.3d 1224,

1239 (10th Cir. 2002).[17]

b. *Fourteenth Amendment*

A defendant's Fourteenth Amendment due process rights are violated when the state introduces victim impact evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825. Victim impact testimony that is highly emotionally charged may have this effect. *See Short v. Sirmons*, 472 F.3d 1177, 1193 (10th Cir. 2006). In this case, the OCCA held that the victim impact statement was "highly charged" and exceeded the bounds of permissibility. *Stouffer v. Oklahoma*, 147 P.3d at 274. But the OCCA nevertheless determined the error was not reversible because it was "clear" the statement "did not have a prejudicial effect on the outcome of this case." *Id.*

3. **Challenged victim impact testimony**

Ms. Reaves's sister, Dana Wheat, offered victim impact testimony during the penalty stage of trial. She described the poor health of Ms. Reaves's parents, the community's emotional reaction to Ms. Reaves's murder, and the details of her funeral, including that Ms. Reaves's casket was kept closed because of the condition of her body. Regarding Ms. Reaves's body, Ms. Wheat said:

---

[17] Oklahoma law authorizes the admission of victim impact testimony, including constitutionally prohibited evidence such as sentencing recommendations and characterization of the crime and defendant. Okla. Stat. tit. 21, § 142A-1. The OCCA has upheld this practice, *see, e.g.*, *Ledbetter v. State*, 933 P.2d 880, 890-91 (Okla. Crim. App. 1997), and the Tenth Circuit has held it unconstitutional on multiple occasions. *E.g. Lockett*, 711 F.3d at 1236; *Selsor*, 644 F.3d at 1026–27.

> [T]he funeral home told us that she was beautiful. We—most of her friends wanted to say goodbye to her . . . so we opened the—had the casket opened. And when I got down to see her she was appalling. She couldn't be viewed. I just had the casket closed and a picture put on top. She was not recognizable as my sister . . . When I think of my sister I always think of that scene. That was my last scene of her. . . . The way she looked in that coffin.

2nd Stage Tr. Vol. III at 449-50. The prosecutor also asked Ms. Wheat about the school children Ms. Reaves had taught and their response to her death. Ms. Wheat said:

> Well, after the kids found out about what had happened, they all got together as a class and wrote letters to us and drew pictures and sent them back to our house in a big envelope and they were real touching. They were beautiful. . . .
>
> [*Prosecutor*:] You made a note here that Linda's chance of helping the development of any more children ended with her murder. . . .
>
> [*Ms. Wheat*:] Well, when I had to go to the school and help the new teacher box up all of her personal things . . . they had an Indian presentation. One of her kids was Indian and the mother had brought a ceremonial shawl as part of their demonstration and gave it to Linda. It was one of those handmade shawls. . . . [T]hey were going to set a memorial in the library in her name.

*Id.* at 452. Defense counsel did not object to this testimony at the time.

4. **No constitutional violation**

a. *Eighth Amendment*

The OCCA and the district court analyzed the victim impact statement on due process grounds. It is not clear whether either court conducted an Eighth Amendment analysis. If Mr. Stouffer made an Eighth Amendment claim, it quickly fails. Ms.

Wheat's testimony did not include any statements prohibited by the Eighth Amendment. She made no sentencing recommendations, she offered no opinion about Mr. Stouffer's characteristics, and she did not describe the crimes. *See Lockett*, 711 F.3d at 1235. In short, the Eighth Amendment's limitations are not at issue.

b. *Fourteenth Amendment*

The OCCA held that portions of the victim impact statement were "highly charged" and therefore improper but "did not have a prejudicial effect" on the jury's sentencing decision. *Stouffer v. Oklahoma*, 147 P.3d at 274. After careful review of the victim impact testimony and the overall aggravating and mitigating circumstances in this case, we conclude the OCCA's holding survives AEDPA deference.

Improper victim impact evidence does not entitle the defendant to relief unless it caused actual prejudice, rendering the trial or the sentencing unfair. *See Short*, 472 F.3d at 1195. To "assess the alleged prejudicial effect of the victim-impact testimony," we must "examin[e] the aggravating and mitigating factors and the overall strength of the State's case." *Id.* at 1193. In a collateral review of a state court's criminal judgment, an error is deemed "harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).[18] A substantial and injurious effect exists if a

---

[18] In a direct review of a state court criminal judgment, a constitutional error requires reversal unless a court finds it was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). But in a collateral review of a state

Continued . . .

-37-

"court finds itself in grave doubt about the effect of the error on the jury's [sentencing decision]." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) (quotations omitted).

The jury found two aggravating circumstances—that Mr. Stouffer caused a great risk of death to more than one person, and that the murder was committed to avoid arrest or prosecution. The evidence supporting these aggravators was considerable. Mr. Ivens testified that Mr. Stouffer shot both him and Ms. Reaves. Ms. Reaves died as a result, and Mr. Ivens's attending physician testified that nine of ten people would not have survived the same injuries. This evidence supported the great risk aggravator. Velva Ivens testified that Mr. Stouffer confessed to her that he had shot Mr. Ivens because he was angry, and the State introduced evidence that Mr. Stouffer had staged the crime scene. This evidence supports the inference that Mr. Stouffer killed Ms. Reaves to avoid arrest or prosecution.

Moreover, the testimony of several guilt stage witnesses was arguably more emotionally charged than the victim impact statement. For example, Mr. Ivens testified that Mr. Stouffer had shot him and described the trauma of struggling to crawl to a telephone to call 911. The jury heard a recording of the dramatic 911 call, in which Mr.

---

Cont.

court's criminal judgment, a federal court must apply the "more forgiving standard," known as the *Brecht* standard. *See Fry*, 551 U.S. at 116; *Brecht*, 507 U.S. at 631; *Bland v. Sirmons*, 549 F.3d 999, 1009 (10th Cir. 2006). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (quotations omitted).

Ivens was audibly "in agony and of the belief that he [was] dying." *Stouffer v. Workman*, No. CIV-07-1312-C, 2011 WL 4916554, at \*11 (W.D. Okla. Oct. 17, 2011). Law enforcement witnesses described a grisly crime scene. They testified that Ms. Reaves "had a head wound—her skull was exposed to the brain," and she was still breathing when police arrived. *Stouffer v. Oklahoma*, 147 P.3d at 277.

By comparison, Mr. Stouffer's mitigation evidence was modest. He presented five mitigation witnesses. Three witnesses, including a minister, testified that Mr. Stouffer was active in his church, where he was well liked and volunteered regularly. The witnesses described him as handsome and a "dynamo personality," and as someone who "loved God and helping people." 2nd Stage Tr. Vol. III at 463. Mr. Stouffer's son told the jury that Mr. Stouffer was a good father, that he had been a good step-father to Doug and Velva Ivens's daughters, and that he volunteered his time teaching kids to ski. Finally, Mr. Stouffer's mother testified that he was a Boy Scout and a good son.

After carefully weighing the aggravating and mitigating evidence, we agree that although the mitigating evidence indicated Mr. Stouffer had "some positive attributes, it was not so compelling as to" overcome the "extensive" aggravating evidence and the jury's finding of two aggravating circumstances. *Stouffer v. Workman*, 2011 WL 4916554, at \*15. We cannot say that the victim impact statement had "a substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 116 (quotations omitted). The OCCA's holding therefore survives AEDPA review. We affirm the denial of relief on this issue.

### D. *Cumulative Error*

Finally, Mr. Stouffer argues that the cumulative effect of all the errors in this case warrant reversal. "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). We aggregate all of the errors in Mr. Stouffer's trial and consider whether their cumulative effect "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Wilson v. Sirmons*, 536 F.3d 1064, 1122 (10th Cir. 2008) (quotations omitted).

This trial involved errors or potential errors on three grounds: the failure to investigate improper juror communication, the four improper comments by the prosecutor, and the emotionally-charged victim impact testimony. The improper prosecutorial comments occurred in the guilt stage, and the other two occurred in the penalty stage.

We concluded earlier that the improper prosecutorial comments during the guilt stage did not affect the jury's verdict, individually or taken together. As the OCCA noted, the evidence of Mr. Stouffer's guilt was overwhelming because he "left a living eyewitness; one who he has not shown has any reason to lie about what happened or whose testimony [was] in any way impeached." *Stouffer v. Oklahoma*, 147 P.3d at 280.

Two possible errors occurred in the penalty stage: the failure to investigate

improper juror communication and the portions of the victim impact statement the OCCA deemed improper. Without a *Remmer* hearing, we cannot effectively determine the existence or extent of the prejudice from the improper juror communication. Thus, our cumulative error analysis can include only the effect of the victim impact statement—which the OCCA found was not prejudicial—along with any possible lingering prejudice from the improper prosecutor statements at the guilt stage. The OCCA's cumulative error analysis considered both errors and held that "[n]one of these alleged or possible errors viewed in a cumulative fashion caused Stouffer to receive an unfair trial." *Id*.

Mr. Stouffer has not pointed to any Supreme Court case requiring reversal in these circumstances, and we cannot say that the OCCA's cumulative error holding was unreasonable. We therefore affirm the denial of relief on this issue.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of habeas relief on Mr. Stouffer's claims of prosecutorial misconduct and improper victim impact testimony. We reverse the district court's holding that the improper external juror communication in Mr. Stouffer's trial was harmless and remand to the district court to conduct a *Remmer* hearing to determine whether this improper communication influenced the jury.

Finally, Mr. Stouffer moved this court to expand his COA to include five additional grounds. The district court denied a COA on these grounds, finding that none were "debatable among jurists of reason or . . . adequate to deserve encouragement to proceed further." Certificate of Appealability, *Stouffer v. Workman*, No. CIV-07-1312-C,

slip op. at *2 (W.D. Okla. Oct. 17, 2011) (unpublished). After reviewing Mr. Stouffer's arguments, we agree with the district court that the issues are not debatable. We therefore deny Mr. Stouffer's motion to expand his COA.