**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 17, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BIGLER JOBE STOUFFER, II,

      Petitioner - Appellant,

v.

KEVIN DUCKWORTH, Interim Warden,
Oklahoma State Penitentiary,[*]

      Respondent - Appellee.

No. 14-6211

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:07-CV-01312-C)**
_____

John T. Carlson, Assistant Federal Public Defender, Office of the Federal Public
Defender for the Districts of Colorado and Wyoming, Denver, Colorado (Virginia L.
Grady, Federal Public Defender, Office of the Federal Public Defender for the Districts
of Colorado and Wyoming, Denver, Colorado, and Mark H. Barrett, Law Offices of Mark
H. Barrett, Norman, Oklahoma, with him on the brief), appearing for Appellant.

Jennifer J. Dickson, Assistant Attorney General (E. Scott Pruitt, Attorney General, with
her on the brief), Office of the Attorney General for the State of Oklahoma, Oklahoma
City, Oklahoma, appearing for Appellee.
_____

Before **LUCERO**, **O'BRIEN**, and **MATHESON**, Circuit Judges.
_____

[*] Pursuant to Fed. R. App. P. 43(c)(2), Kevin Duckworth replaced Jerry Chrisman
as Interim Warden of the Oklahoma State Penitentiary, effective May 9, 2016.

**MATHESON**, Circuit Judge.

Bigler Jobe Stouffer was convicted in Oklahoma state court of first-degree murder and shooting with intent to kill. The jury sentenced him to death for the murder charge. After his direct appeal and state post-conviction proceedings were unsuccessful, Mr. Stouffer filed a 28 U.S.C. § 2254 habeas corpus application in federal court, alleging a juror had improperly communicated with her husband about the case during the penalty phase of trial. In *Stouffer v. Trammell*, 738 F.3d 1205 (10th Cir. 2013), we held the district court erred by failing to conduct an evidentiary hearing on Mr. Stouffer's claim of jury tampering. We therefore remanded to the district court to conduct a hearing and rule on Mr. Stouffer's claim. Based on evidence presented at a day-long evidentiary hearing, the district court determined Mr. Stouffer's right to an impartial jury had not been violated and denied his § 2254 application.

Mr. Stouffer now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

On January 24, 1985, Mr. Stouffer visited Doug Ivens's house to borrow a pistol. *Stouffer*, 738 F.3d at 1212. He used that pistol to shoot Mr. Ivens three times and Mr. Ivens's girlfriend, Linda Reaves, twice. *Id.* Mr. Ivens survived. *Id.* Ms. Reaves died from her injuries. *Id.*

### A. *Proceedings up to the 2008 Federal Habeas Application*

In 1985, an Oklahoma state court jury convicted Mr. Stouffer of first-degree murder and shooting with intent to kill, for which it imposed sentences of death and life imprisonment, respectively. *Id.* His direct appeal and state post-conviction petition failed. Concluding he had received ineffective assistance of counsel, we granted Mr. Stouffer's 28 U.S.C. § 2254 habeas corpus application in 1999. *Id.*

At Mr. Stouffer's 2003 retrial, another jury convicted him of the same two counts. *Id.* It "sentenced him to death for Ms. Reaves's murder and to 100 years of imprisonment for shooting Mr. Ivens." *Id.* The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Stouffer's convictions and sentences. *Id.* Mr. Stouffer then filed a motion for post-conviction relief in state court, which the OCCA denied. *Id.*

### B. *The 2008 Federal Habeas Application*

On September 8, 2008, Mr. Stouffer filed a § 2254 application for a writ of habeas corpus in the U.S. District Court for the Western District of Oklahoma. *Id.* The district court denied relief on all nine grounds raised in the application but granted a certificate of appealability with respect to four of them: jury tampering, prosecutorial misconduct, victim impact testimony, and cumulative error. *Id.* at 1212-13. On appeal, we affirmed except on the jury tampering claim, on which we reversed and remanded to the district court for an evidentiary hearing. *Id.*

### C. *Basis for Remand to District Court*

Our decision to remand was based on the following facts, which we took from the transcript of Mr. Stouffer's second trial:

Toward the end of the penalty stage of Mr. Stouffer's second trial, defense counsel noticed the husband of Juror Stacey Vetter in the courtroom. Mr. Vetter was "laughing, joking, handshaking, and embracing" with a former roommate of shooting victim Doug Ivens. 2nd Stage Tr. Vol. IV at 605. The roommate was sitting with Mr. Ivens's family. According to the prosecutor, the roommate knew that Mr. Vetter's wife was a juror. Defense counsel approached Mr. Vetter and asked him about his relationship with Mr. Ivens's family and friends. Mr. Vetter responded that he had met them about thirty minutes earlier. As soon as defense counsel turned away, Mr. Vetter "disappeared out of the courtroom," *id.* at 607, and an assistant attorney general watched him "scoot[ ] to the elevator," *id.* at 615.

When proceedings resumed, defense counsel informed the court of Mr. Vetter's presence and activity in the courtroom and asked to question the Vetters as to whether they had communicated about the case. The prosecutor conceded it was appropriate to question Mr. Vetter and the roommate, and the trial court agreed to allow it. The attorneys discovered, however, that both men had left the building immediately after defense counsel had spoken with Mr. Vetter. Defense counsel then suggested taking testimony from another individual who had observed Mr. Vetter in the courtroom—Deputy Boles, the sheriff's deputy responsible for escorting Mr. Stouffer during the trial.

Deputy Boles testified in camera and under oath that he had been present throughout the trial and had observed repeated non-verbal communication between Juror Vetter and her husband. The deputy saw Mr. Vetter repeatedly nod and wink at Juror Vetter throughout the penalty stage testimony and closing arguments. At one point during the prosecution's final closing argument, Juror Vetter looked to her husband with "a questioned look in her face." *Id.* at 608. Mr. Vetter responded by nodding and rolling his eyes.

The deputy attempted to testify that this and other exchanges between the Vetters occurred in response to particular statements by the prosecution that Deputy Boles described as "good points," and that Mr. Vetter expressed agreement with the prosecutor. *Id.* at 609, 612–13. The trial court stopped this testimony, saying that it was speculative and thus inadmissible. The prosecutor interceded, telling the court "I don't have a problem. They have got to make a record here. This [is about the] deputy's perspective. He's a human being. He ought to be able to offer his opinion." *Id.* at 613. The court relented and permitted limited testimony from the deputy.

Deputy Boles then testified that when Juror Vetter had given her husband the questioned look, it was in response to a "strong point" by the prosecutor. *Id.* at 613. From the deputy's perception, the communication

between the Vetters expressed agreement with the prosecution and indicated to the deputy that Mr. Stouffer was "screwed." *Id.* at 614.

In response to this testimony, the defense asked for a mistrial or alternatively to conduct "further inquiry," *id.* at 615, or to "cross examine" Juror Vetter, *id.* at 622. The trial court denied the motion for mistrial and failed to respond to the alternative requests for more investigation into the Vetters' communication. The trial court concluded that the defense had produced nothing more than "a lot of speculation." *Id.* at 615. The court seemed to confine its analysis to whether Deputy Boles's testimony proved that Juror Vetter had spoken with her husband about the case outside the courtroom. The court did not say clearly whether the non-verbal communication in the courtroom during proceedings constituted improper juror contact.

*Id.* at 1215-16 (brackets in original) (footnotes omitted).

We held "the Vetters' repeated non-verbal communications—which occurred inside the courtroom, during proceedings, and apparently concerned the attorneys' closing arguments—were . . . improper." *Id.* at 1217. "[T]he timing and context of the Vetters' non-verbal communications and the deputy's specific observations," we wrote, "strongly indicate they were discussing matters pending before the jury." *Id.*

We concluded the state trial court's failure to conduct a hearing and create an adequate record made it impossible "for us to conclude that Mr. Vetter's communications with Juror Vetter did not prejudice Mr. Stouffer" or to determine whether any prejudice that may have resulted from those communications was harmless. *Id.* at 1217-19. As a result, we held the federal district court "erred in conducting a harmlessness analysis without holding an evidentiary hearing" to "uncover the facts and circumstances of the contact, including the substance and extent of Juror Vetter's communication with her husband about the case, whether other jurors were aware of this communication, and

whether they influenced her decision or other jurors' decisions about Mr. Stouffer's sentence." *Id.* at 1219.

We therefore remanded to the district court to conduct an evidentiary hearing. *Id.* at 1220.

### D. *Proceedings on Remand*

On September 3, 2014, the district court held a day-long evidentiary hearing to explore the issues we identified in *Stouffer*. At the beginning of that hearing, the court announced it read our *Stouffer* opinion as establishing "the presumption of prejudice" and placing on the State "the burden of showing . . . the existence of harmless error." ROA, Vol. 2 at 20.

### 1. **Stipulations**

Before the hearing, the parties stipulated that if called, jurors Daniel Dale Andrews, Holly Rea Parker, and David Knight would testify they were not aware of any improper communications between Juror Vetter and her husband during trial. The district court also admitted into evidence the obituaries of two other jurors from Mr. Stouffer's 2003 retrial.

### 2. **The State's Witnesses**

The State presented testimony from all remaining jurors from the 2003 retrial, as well as Juror Vetter's husband, George Brian Vetter.

#### a. *Juror Judith Reann Douglass*

Judith Reann Douglass, who served as a juror at the 2003 retrial, testified that Juror Vetter pointed out her husband to fellow jurors during trial. As the jurors were

- 6 -

getting settled in the jury box one day—Juror Douglass could not remember exactly which day—Juror Vetter allegedly looked out into the gallery, smiled, and nodded at her husband, who "looked back and smiled." ROA, Vol. 2 at 25-26. Although the Vetters did not exchange words, Juror Douglass testified that Juror Vetter and Mr. Vetter "did head movements" toward one another. *Id.* at 27. Juror Douglass thought Juror Vetter mouthed "I love you" to her husband, but other than that, she "did not know exactly what they were saying." *Id.* at 28. She said she "assumed" they were communicating about Mr. Stouffer's case. *Id.* at 29.

On cross-examination, Juror Douglass testified she saw Mr. Vetter sitting with Mr. Ivens's family and talking to Mr. Ivens in the courtroom gallery. She also said she saw Mr. Vetter shake Mr. Ivens's hand during a break in trial.

Juror Douglass admitted on redirect that in 2005 she had pled guilty to falsifying a police report.

b. *Juror Stacey Vetter*

Juror Vetter testified that Mr. Vetter attended trial only on the last day of the guilt stage. While he was in the courtroom, she had no communication with him, either verbal or nonverbal, she said. Nor did he share information about the case with her at any time during the entire course of trial. At no point did she "have anybody else there that [she] knew that was a male that was not a juror that [she] would be talking to." *Id.* at 53. Juror Vetter testified she never received "any outside information from anybody in the gallery." *Id.* at 54. The only communication she remembered having with her husband during trial came when she phoned home one night to inform him she would be staying at

a hotel because the jury had been sequestered.[1]  According to Juror Vetter, her vote to impose the death penalty was not based on any evidence she received from "an outside party."  *Id.* at 55.

On cross-examination, Juror Vetter said she could not remember whether her husband had sat with Mr. Ivens's family when he attended trial.  When presented with a diagram of the state courtroom, however, she confirmed Mr. Vetter had sat in the "approximate spot" of an "X" indicating where Mr. Ivens's family had been located.  *Id.* at 62.

    c.  *George Brian Vetter*

Mr. Vetter was adamant he attended the trial only on the day the jury announced its guilty verdict.  He testified he entered the courtroom on his own and stayed for no more than 30 minutes.  He said he never communicated about the case with his (now ex-) wife or attempted to influence her decision while she was serving as a juror, though he did wink at her when she entered the courtroom and took her seat in the jury box.  According to Mr. Vetter, the wink, to which his wife responded with a smile, was intended only as a greeting and was not designed to influence her vote in the case.  While in the courtroom, he said, he did not observe any witness testimony or argument by the attorneys.

---

[1] When asked whether she would have any reason to disagree with the state court record if it indicated she received a second phone call from her husband during trial, she said she would not.

Mr. Vetter testified an "elderly lady" in the gallery asked him whether he "was a part of the defense or the family," to which he responded his wife was on the jury. *Id.* at 73. This "elderly lady" introduced herself as Mr. Ivens's mother. In addition, he said he was approached by "a big gentleman" on Mr. Stouffer's defense team, who asked Mr. Vetter's name. *Id.* at 76. After that brief encounter, Mr. Vetter left the courthouse because he had to return to work.

On cross-examination, Mr. Vetter testified he was "not joking with anybody or hugging anybody," and did not have his arm around anybody while he was at the trial. *Id.* at 86. He said the only people whose hands he shook were Mr. Ivens's mother and Mr. Stouffer's attorney, Mr. Anderson.

d. *Other Jurors*

The State presented testimony from the remaining members of Mr. Stouffer's jury. No juror testified to (1) seeing Juror Vetter communicate with anyone in the courtroom gallery or (2) recalling discussion by Juror Vetter about extraneous information during deliberations. Nothing in the jurors' testimony suggests they based their decision to impose the death penalty on anything other than the evidence at trial.

3. **Mr. Stouffer's Witnesses**

a. *Deputy Ralph Manuel Boles*

Deputy Boles testified that during Mr. Stouffer's trial he would "occasionally look at the gallery." *Id.* at 155. He did so because his security training had taught him to keep an eye out for "anything that could go wrong" in cases featuring in-custody defendants

like Mr. Stouffer. *Id.* Accordingly, he "pick[ed] [his] seat in the courtroom so that [he] could have a good view of everything, including the gallery." *Id.*

Deputy Boles said that on "the day of closing arguments," he witnessed Juror Vetter repeatedly making eye contact with someone in the gallery with whom she had entered the courtroom that morning. *Id.* at 156. He could not remember whether the closing arguments were those of the first or second stage of trial.

After the prosecutor made a certain point to the jury, "Juror Vetter look[ed] to the gallery at this unknown male, and then he kind of look[ed] back, and they kind of roll[ed] their eyes at each other." *Id.* Deputy Boles believed the eye-rolling expressed Juror Vetter and her companion's belief that Mr. Stouffer was "screwed." *Id.* at 157. This exchange was the most "obvious" communication between Juror Vetter and the man in the gallery, but in total they exchanged glances or nods on "three to four occasions." *Id.* According to Deputy Boles, it was "clear . . . that they were communicating about the case." *Id.* at 160. Based on what he witnessed, it would be "[im]possible . . . for anyone to conclude that the communication between the Vetters was limited to a wink and a smile." *Id.*

According to Deputy Boles, Juror Vetter and her husband communicated nonverbally during both sides' closing arguments. The Vetters "acknowledg[ed] strong points that the defense made as well," and their nods and glances "were not one-sided." *Id.* at 167. But the "most prominent communication was the one that basically said 'he's screwed.'" *Id.* at 168. More exchanges were pro-prosecution than pro-defense.

Deputy Boles testified that after witnessing these exchanges, he talked with Mr. Stouffer's attorneys, who asked him whether he had seen, as they had, Juror Vetter communicating with someone in the gallery. Deputy Boles said he later learned, at the trial judge's in camera conference, that the man he saw communicating with Juror Vetter was her husband. But even before that, he had suspected the man was Juror Vetter's "significant other of some kind," based on their interactions with each other and "the[ir] body actions as they c[a]me in" the courtroom together that morning. *Id.* at 162. He had no memory of seeing Mr. Vetter on any day other than the day of closing arguments.

On cross-examination, Deputy Boles described the look the Vetters exchanged as "kind of like, duh." *Id.* at 163. It was therefore possible, he agreed, that "Ms. Vetter already had her mind made up about whether she thought the [prosecutor's] point was a good point or not." *Id.*

b. *JoAnn Grider*

JoAnn Grider, then a private investigator working pro bono for Mr. Stouffer's defense team, attended almost all of the 2003 retrial. During the last week of the guilt phase, she observed Juror Vetter "and a man in the audience making signals, nodding their head to each other." *Id.* at 174. Ms. Grider said she did not know who the man was, but she assumed it was Juror Vetter's husband because the two of them "would go to lunch together." *Id.* at 175. According to Ms. Grider, the man was seated behind the prosecution table, about 15 feet from where Juror Vetter was seated. She did not see him interact with any of the people sitting nearby.

- 11 -

On cross-examination, Ms. Grider said she has sent Mr. Stouffer letters in prison. Ms. Grider at first denied ever sending those letters in attorney's envelopes, which are not monitored by jail staff. But she later admitted she had "an agreement" with one of Mr. Stouffer's attorneys whereby if she had something to send to Mr. Stouffer, she would hand it to the attorney for mailing in a privileged envelope. *Id.* at 186.

    c. *Defense Attorney Gary James*

Gary James was lead defense counsel at Mr. Stouffer's 2003 retrial. Several times while he was at the lectern, he "caught out of the periphery of [his] vision that [Juror] Vetter would have turned towards her right . . . towards the audience, no longer looking towards the bench nor the witness." *Id.* at 190. The victims' families, "most of the prosecution," and the victim witness coordinator were seated in the area toward which Juror Vetter turned. *Id.* at 191. Although he could not be sure, Mr. James believed he saw Juror Vetter turn toward the audience during the penalty stage, rather than the guilt stage, of the trial.

On the last day of the penalty phase, Mr. James testified, a man entered the courtroom, sat down by the victims' families and Mr. Ivens's former college roommate, and appeared to shake hands and introduce himself. At some point—either then or at the end of jury instructions—Mr. James saw this man "hugging" the family members, "slapping [them] on the back," and placing his arm around them as if they were friends. *Id.* at 194. Mr. James testified he took Mr. Stouffer's other counsel, Mr. Anderson, out into the hall and said he thought "there[ was] something up between [Juror] Vetter and

the man and the people—the victim's family. There[ was] something going on." *Id.* at 195.

Mr. James acknowledged on cross-examination that he had no personal knowledge of the man's identity. Rather, he later learned from Mr. Anderson that the man was Juror Vetter's husband.

### d. *Defense Attorney Richard Anderson*

Mr. Stouffer's last witness was defense counsel Richard Anderson, who served as second chair at the 2003 retrial. At some point during the penalty phase, "it was brought to [Mr. Anderson's] attention that [Juror] Vetter was there with a man that—the way they were engaged, it appeared it was obviously her husband." *Id.* at 201.[2] He then observed "some communication" between Juror Vetter and somebody in the portion of the courtroom where Mr. Ivens's family was seated. *Id.*

Suspecting Juror Vetter was communicating with her husband, Mr. Anderson approached a man who "was in a very congratulatory, handshaking-type manner and was communicating with members of the Doug Ivens group." *Id.* at 202-03. That man confirmed to Mr. Anderson that he was Juror Vetter's husband, Mr. Anderson testified. When Mr. Anderson approached him, Mr. Vetter was with one of the people he had placed his arm around previously, who introduced himself as Ted Roland. Mr. Anderson

---

[2] Mr. Anderson changed his story slightly on cross-examination, saying he himself observed Juror Vetter and the unidentified man enter the courtroom that morning.

said he later learned Mr. Roland was Mr. Ivens's former roommate. Mr. Anderson asked Mr. Vetter to remain in the courthouse, but Mr. Vetter departed.

On cross-examination, Mr. Anderson said he could not remember whether he observed communication between Juror Vetter and the man with whom she entered the courtroom, and whom Mr. Anderson later presumed to be her husband.

4. **The District Court's Ruling**

On September 25, 2014, the district court entered a short order denying Mr. Stouffer's § 2254 jury tampering claim. The order contained the following "findings of fact":

> Mr. Vetter and Juror Vetter had no verbal conversations about the case other than a short telephone call during the second stage of trial when Juror Vetter was informing her husband the jury was to be sequestered. During that call Mr. Vetter told Juror Vetter his father informed him there was a newspaper article about the jurors. Juror Vetter told her husband she could not talk about it and nothing more was discussed. Mr. Vetter did not see his wife until she entered the courtroom. He did not talk with his wife about the case and did not witness any of the testimony presented or attorneys' arguments. The only "communication" between the two consisted of a wink and smile from Mr. Vetter to his wife when the jury was entering the courtroom before the first stage verdict, to which she mouthed that she loved him. He meant the gesture as a greeting and was not attempting to influence her in any manner. Juror Vetter only saw her husband that one day of trial and did not communicate or learn anything about the trial or [Mr. Stouffer] from her husband or from anyone in the gallery.
> . . . None of the jurors witnessed any verbal or non-verbal communication between Juror Vetter and anyone in the gallery.
> . . . [A]ll of the jurors based their decisions and verdict on the evidence and testimony presented in court.
> The Court finds Juror Douglas's [sic] testimony regarding communication between the Vetters . . . to be less than credible. . . .

ROA, Vol. 1 at 472-74. To support its conclusion that Juror Douglass was not credible, the district court noted her 2005 conviction for falsifying a police report.

Based on these findings, the court concluded any communication between the Vetters was harmless:

> Assuming some improper communication to have occurred during the second stage of [Mr. Stouffer's] trial, [the State] has demonstrated any and all communication to be harmless. Other than a brief recognition and salutation between the Vetters, no jurors witnessed any communication between any member of the jury and anyone in the gallery. . . . [None] of the jurors [was] improperly influenced by outside communication. The verdict was the result of deliberations based on the evidence and testimony presented during trial and was the collective product of each juror's non-influenced determination. Any possible improper communication was harmless.

ROA, Vol. 1 at 474.

On September 25, 2014, the district court entered judgment in favor of the State and denied a certificate of appealability. Four days later, at the State's urging, the district court entered a "Corrected Order" revising two aspects of its original order that are immaterial to this appeal.

Mr. Stouffer filed a notice of appeal on October 24, 2014. On July 8, 2015, we issued a certificate of appealability limited to the question "whether the district court erred in its resolution of the jury tampering issue that this court remanded on December 26, 2013." Doc. 10284932.

## II. **DISCUSSION**

The district court's order offers brief analysis, but its denial of relief is appropriate. The order does not discuss the state court evidence or Mr. Stouffer's

- 15 -

evidence from the evidentiary hearing. And according to Mr. Stouffer, it mistakenly finds that Mr. Vetter did not attend trial on the final day of the penalty stage, despite the state court record establishing otherwise. Even assuming Mr. Stouffer is correct, his arguments would not change the outcome of this appeal. The State presented testimony at the hearing demonstrating that no juror, including Juror Vetter, based his or her vote on anything other than the evidence produced at trial. Mr. Stouffer's evidence showed in-court non-verbal communication between the Vetters, but not any effect on Juror Vetter's vote. The record therefore does not show prejudice to Mr. Stouffer, and the district court did not err in determining that any improper communication between the Vetters was harmless.

A. <b><i>Legal Background</i></b>

### 1. Law of Juror Bias

a. *Right to an Impartial Jury*

"The Sixth Amendment as incorporated by the Fourteenth Amendment guarantees the right of a trial by jury in all state criminal cases." *Goss v. Nelson*, 439 F.3d 621, 627 (10th Cir. 2006). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "Included in that right is the right to a jury capable and willing to decide the case solely on the evidence before it." *United States v. Brooks*, 569 F.3d 1284, 1288 (10th Cir. 2009) (quotation omitted). "Though no trial can be perfect, one touchstone of a fair trial is an impartial trier of fact." *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1258-59 (10th Cir. 1999) (citation, quotation, and brackets omitted).

"Because impartial jurors are the cornerstone of our system of justice and central to the Sixth Amendment's promise of a fair trial, we guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Stouffer*, 738 F.3d at 1213 (quotations omitted).

b. Remmer *Hearings*

Faced with "credible evidence of jury tampering"—that is, "improper external communication with a juror about a matter pending before the jury"—"a trial court has a duty to investigate." *Id.* "When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *Id.* at 1214 (quotation omitted).

These hearings are known as "*Remmer* hearings," after the Supreme Court's seminal decision in *Remmer v. United States*, 347 U.S. 227 (1954). There, the Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer*, 347 U.S. at 229. As we explained in *Stouffer*, "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and a hearing of the defendant, that such contact with the juror was harmless to the defendant." 738 F.3d at 1214 n.5 (quoting *Remmer*, 347 U.S. at 229). "Once the government rebuts the presumption of

- 17 -

prejudice in a *Remmer* hearing, the burden then shifts to defendant to show actual

prejudice." *United States v. Armendariz*, 922 F.2d 602, 606 (10th Cir. 1990).[3]

After presentation of the parties' evidence, the district court analyzes the substance

of any improper communications in light of "the entire record." *United States v. Aguirre*,

108 F.3d 1284, 1288 (10th Cir. 1997); *see also Mayhue v. St. Francis Hosp. of Wichita,

Inc.*, 969 F.2d 919, 924 (10th Cir. 1992) (calling for holistic examination of "all of the

facts and circumstances of the case"). The court's inquiry should be "objective," asking

only how a reasonable person in the jurors' position would be affected by the improper

communications. *United States v. Klein*, 93 F.3d 698, 703 (10th Cir. 1996).

   c. *Remedy for Violation of Right to an Impartial Jury*

If a defendant's right to an impartial jury has been violated, he is entitled to a new

trial. *See United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003). But "not every

incident [involving bias] requires a new trial. The test is whether . . . the misconduct has

prejudiced the defendant to the extent that he has not received a fair trial." *United States

v. Lawrence*, 405 F.3d 888, 904 (10th Cir. 2005) (alterations in original) (quotation

omitted).

---

[3] We have said "the presumption of prejudice approach relieves the moving party of any burden and forces the nonmovant to prove any exposure was harmless." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1242 (10th Cir. 2000). But this comment appeared in a discussion of "the placement of the *initial* burden of proof" under *Remmer*. *Id.* at 1241 (emphasis added). *Smith* did not displace our holding in *Armendariz* that once the government rebuts the *Remmer* presumption, a defendant must introduce affirmative evidence of prejudice. *See United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005) (explaining government has "the *initial* burden of proof" under *Remmer* (emphasis added)).

In conducting the fair-trial analysis, we recognize that "the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'" *United States v. Day*, 830 F.2d 1099, 1103 (10th Cir. 1987) (alterations in original) (quoting *Rushen v. Spain*, 464 U.S. 114, 118 (1983) (per curiam)). "Surmise and suspicion may not be used to assail the integrity of a jury; it is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the court." *Vigil v. Solano*, 947 F.2d 955, 1991 WL 230177, at *4 (10th Cir. Nov. 8, 1991) (unpublished) (quoting *United States v. Gigax*, 605 F.2d 507, 515 (10th Cir. 1979)).[4] Accordingly, "something more than 'unverified conjecture' [is] needed where only potentially suspicious circumstances are shown." *Id.* (quoting *United States v. Jones*, 707 F.2d 1169, 1173 (10th Cir. 1983)).

2. **Federal Habeas Review of State Court Decisions**

When a prisoner's habeas claim was adjudicated on the merits in state court, § 2254 relief is available only if the prisoner satisfies the demanding standards contained in the Antiterrorism and Effective Death Penalty Act of 1996. *Wilson v. Sirmons*, 536 F.3d 1064, 1073 (10th Cir. 2008). But "[i]f the state court did not decide the claim on the

_____

[4] Although not precedential, we find the reasoning of this and the other unpublished opinions cited in this opinion to be instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

- 19 -

merits, the stringent principles of deference under 28 U.S.C. § 2254 are inapplicable." *Id.* at 1074. In that case, federal habeas courts review the claim de novo. *Fairchild v. Trammell*, 784 F.3d 702, 712 (10th Cir. 2015).

Because the Oklahoma courts did not address Mr. Stouffer's jury-tampering claim on the merits, *Stouffer*, 738 F.3d at 1213, we review that claim unconstrained by AEDPA deference.

### B. *Standard of Review*

When a district court conducts an evidentiary hearing in a § 2254 case, we review its factual findings for clear error and its legal conclusions de novo. *Cannon v. Trammell*, 796 F.3d 1256, 1271 (10th Cir. 2015).

"We will reverse for clear error only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Martinez-Jimenez*, 464 F.3d 1205, 1209 (10th Cir. 2006) (quotation omitted). A district court's factual finding is also clearly erroneous "if it is simply not plausible or permissible in light of the entire record on appeal." *United States v. Gould*, 672 F.3d 930, 935 (10th Cir. 2012) (quotation omitted).

### C. *The District Court's Order*

After a thorough review of the record, we conclude the district court properly determined Mr. Stouffer's right to an impartial jury was not violated.

1. **Date of Mr. Vetter's Attendance**

The State, for reasons that are unclear, insists on defending the district court's finding that Mr. Vetter attended only the last day of the guilt phase. But the state court record unambiguously refutes that proposition.

Transcripts from state court clearly establish Mr. Anderson alerted the trial judge to possible improper communications on the last day of the penalty stage. 2d Stage Tr. Vol. IV at 604. When Mr. Anderson informed the court of his concerns, the attorneys had just finished delivering their closing arguments as to the appropriate punishment. *Id.* at 539, 553, 574. The jury had already rendered its guilty verdict. *Id.* at 554. Mr. Anderson told the court during an in camera conference that he had approached the man he saw associating with the Ivens attendees in the gallery, and that man introduced himself as Juror Vetter's husband. *Id.* at 605. The prosecutor confirmed during that conference that he had spoken with Mr. Roland, who said he was approached that morning by a man who introduced himself as the husband of a juror. *Id.* at 617.

The district court's order did not mention this contemporaneous evidence from the state court record. In concluding Mr. Vetter attended only the last day of the guilt stage, the order discussed only the Vetters' testimony, which was offered 11 years after the events in question. Such dated testimony is often less probative than transcript evidence generated at or near the time of the events in question. *See E.E.O.C. v. Sperry Corp.*, 852 F.2d 503, 508 (10th Cir. 1988) ("Contemporaneous documentation is more reliable than a witness' memory of an event which occurred years earlier.").

2. **Other Factual Findings**

Among other things, the district court also found that (1) Mr. Vetter "did not talk with his wife about the case and did not witness any of the testimony presented or attorneys' arguments"; (2) the "only 'communication' between the two consisted of a wink and smile from Mr. Vetter to his wife when the jury was entering the courtroom before the first stage verdict, to which she mouthed that she loved him"; and (3) "Juror Vetter only saw her husband that one day of trial and did not communicate or learn anything about the trial or [Mr. Stouffer] from her husband or from anyone in the gallery." ROA, Vol. 1 at 472-73.

These findings conflict with other evidence from the September 2014 evidentiary hearing. In particular, Deputy Boles testified that on three or four occasions, he saw Juror Vetter exchange nods or glances with a man in the gallery, whom he later learned to be Mr. Vetter. Deputy Boles said at least one of these exchanges—all of which he thought pertained to the case—indicated Juror Vetter thought Mr. Stouffer was "screwed." ROA, Vol. 2 at 157. Most of them were pro-prosecution. The Vetters' communication, in Deputy Boles's view, was not "limited to a wink and a smile." ROA, Vol. 2 at 160.

In addition, Juror Douglass and Ms. Grider testified to seeing Juror Vetter nod her head at a man in the audience. And Mr. Anderson testified that during the penalty phase, he witnessed Juror Vetter communicating nonverbally with people in the section of the gallery where Mr. Ivens's family was seated. After the jury left to deliberate, he approached one of those people, who identified himself as Juror Vetter's husband.

- 22 -

The district court's order does not attempt to (1) reconcile this testimony with the Vetters' testimony or (2) fully explain why it is not credible.[5] In fact, the order does not mention this testimony or the testimony presented at the state court on this issue.

Due to the foregoing, we consider the entire record in the following analysis.

### D. *Analysis*

Even if Mr. Stouffer's evidence is accepted as true, the record does not show he was deprived of his right to an impartial jury. We therefore affirm dismissal of Mr. Stouffer's § 2254 habeas application.

1. **The Record Does Not Show a Violation of Mr. Stouffer's Right to an Impartial Jury**

Juror Vetter and Mr. Vetter should not have communicated about the case. But assuming they did, "no trial can be perfect," *Cerrato-Reyes*, 176 F.3d at 1258, and the record does not show that Mr. Stouffer did not receive a fair trial.

Detective Boles testified about the Vetters' nonverbal communications (1) in 2003, at the state trial court's in camera hearing, and (2) in 2014, at the evidentiary hearing in federal district court. Although he testified at greater length and was subject to cross-examination at the latter hearing, he did not add materially to his 2003 testimony, which the trial judge found "speculative." *Stouffer*, 738 F.3d at 1215 & n.7, 1216 n.8.

---

[5] As explained above, the district court did find Juror Douglass's testimony "less than credible" in light of her prior conviction and statements she made that were inconsistent with other witnesses' testimony. ROA, Vol. 1 at 474. The court also could reasonably have discounted testimony from Ms. Grider. In any event, Mr. Stouffer does not rely on the testimony of either Juror Douglass or Ms. Grider on appeal.

- 23 -

We remanded so the parties could develop the record as to whether any nonverbal communications affected Juror Vetter or any of her fellow jurors. As to the latter, the State's evidence and the overall record show they were not aware of any communications between the Vetters, and Mr. Stouffer does not contest the district court's finding to that effect. As to Juror Vetter, the State's evidence shows no outside influence on Juror Vetter and the overall record shows that any influence Mr. Vetter's nonverbal communication may have had on her is speculative. Nothing that has come to light since 2003 suggests Mr. Stouffer was deprived of his right to an impartial jury.

Deputy Boles said at the 2014 hearing that he saw the Vetters exchange glances or nods at most four times, a majority of which seemed to be "pro prosecution." ROA, Vol. 2 at 168. It was "clear" to him that the Vetters were communicating about the case, and at one point they rolled their eyes in a manner that suggested Mr. Stouffer was "screwed." *Id.* at 157, 160. Taking Deputy Boles's testimony as true, it does not indicate Mr. Vetter's views affected his wife's consideration of the evidence, and we must presume Juror Vetter followed the trial court's instruction to decide the case solely on the basis of the evidence presented. *See Banks v. Workman*, 692 F.3d 1133, 1150 (10th Cir. 2012). Indeed, Deputy Boles described the look the Vetters exchanged as "kind of like, duh," ROA, Vol. 2 at 163, which suggests she may already have made up her mind regarding Mr. Stouffer's culpability. Even if she had not, the record does not show her husband's non-verbal communications altered her performance as a juror. To conclude these communications undermined Juror Vetter's impartiality, we would have to engage in impermissible "surmise" and "unverified conjecture." *Vigil*, 1991 WL 230177, at *4.

The same goes for the testimony of Mr. Stouffer's trial attorneys. Mr. James said he saw Juror Vetter look toward a section of the gallery in which the victim's family, as well as a man who had entered with her that morning, were seated. He did not testify to observing Juror Vetter communicate with anyone in the gallery. Mr. Anderson did say he saw "some communication" between Juror Vetter and somebody seated in the gallery. ROA, Vol. 2 at 201. But he did not identify Juror Vetter's interlocutor, nor did he suggest the communication concerned Mr. Stouffer's case. On the basis of this testimony, only forbidden "unverified conjecture" could establish that Mr. Stouffer was prejudiced by the Vetters' nonverbal communication. *Vigil*, 1991 WL 230177, at *4. It would require yet further prohibited speculation and conjecture to conclude any prejudice was so great that Mr. Stouffer "has not received a fair trial." *Lawrence*, 405 F.3d at 904.[6]

---

[6] The parties disagree about whether our opinion remanding this case placed on the State the burden of overcoming a presumption of prejudice. We need not resolve this dispute because it does not affect the outcome. Although "this presumption generally does not apply" in habeas proceedings, *Malicoat v. Mullin*, 426 F.3d 1241, 1250 (10th Cir. 2005), we arguably suggested the district court should apply the presumption on remand. Even if the State was required to rebut the *Remmer* presumption, the State carried its burden by presenting evidence showing the Vetters' communications were limited and did not affect Juror Vetter's consideration of the case. The State put on evidence regarding all living jurors in Mr. Stouffer's case, as well as Juror Vetter's husband, none of whom suggested Mr. Vetter interfered with any of the jurors', including Juror Vetter's, impartial performance of their duties. The burden then shifted to Mr. Stouffer to introduce evidence showing "actual prejudice." *Armendariz*, 922 F.2d at 606. For the reasons explained above, we conclude the record does not show prejudice or lack of fair trial. Whether the *Remmer* presumption applies or not, therefore, Mr. Stouffer is not entitled to a new trial.

Mr. Stouffer also contends that by receiving evidence on whether the Vetters communicated during trial, the district court violated the mandate rule, which "requir[es] trial court conformity with the appellate court's terms of remand." *Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014) (quotation omitted).

Continued . . .

2. **Harmless Error and No Showing of Prejudice**

The district court order concluded that "[a]ny possible improper communication [between the Vetters] was harmless." ROA, Vol. 1 at 474. We have determined the record does not show that any improper communications between the Vetters affected Juror Vetter's impartial consideration of the evidence and therefore caused any prejudice to Mr. Stouffer or otherwise undermined his right to a fair trial. This determination leads us to affirm the district court's harmlessness conclusion.

When a § 2254 applicant alleges violation of his constitutional rights, "we apply the harmless-error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L.Ed. 2d 353 (1993), and in *O'Neal v. McAninch*, 513 U.S. 432, 115 S. Ct. 992, 130 L.Ed. 2d 947 (1995)." *Wilson*, 536 F.3d at 1073. Under this standard, "relief is only proper if the error had substantial and injurious effect or influence in determining

---

According to Mr. Stouffer, the district court's "job was not to revisit the existence or content of the historical facts but to decide whether, as this Court instructed, the Vetters' 'improper communication influenced the jury.' The facts were fixed; the question was the harm they produced." Aplt. Br. at 39.

This argument misunderstands the law and our previous opinion. "The scope of the mandate . . . is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1101 (10th Cir. 2015) (ellipsis in original). Because we did not "specifically cabin[]" the district court to examining prejudice, it was free to receive testimony on "historical facts." Moreover, we held in *Stouffer* that the district court had erred by failing to hold "a hearing to uncover *the facts and circumstances of the contact*, including the substance and extent of Juror Vetter's communication with her husband about the case, whether other jurors were aware of this communication, and whether they influenced her decision or other jurors' decisions about Mr. Stouffer's sentence." 738 F.3d at 1219 (emphasis added). The district court was therefore not only permitted but also required to consider the historical facts regarding the Vetters' communication during trial.

- 26 -

the jury's verdict." *Id.* (quotation omitted). "Under the *Brecht*/*McAninch* test a habeas petitioner obtains plenary review to determine whether a trial error resulted in actual prejudice." *Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011) (quotation omitted). The record does not show the Vetters' communications "had substantial and injurious effect or influence in determining the jury's verdict." *Wilson*, 536 F.3d at 1073 (quotation omitted).[7]

### III. **CONCLUSION**

Our review of the state record and the district court's evidentiary hearing does not show a violation of the right to an impartial jury. We therefore affirm denial of Mr. Stouffer's § 2254 habeas corpus application.

---

[7] At the evidentiary hearing, Juror Douglass testified that during deliberations, Juror Vetter (1) told other jurors "we need to put [Mr. Stouffer] back on death row," ROA, Vol. 2 at 31, and (2) harassed Juror Douglass by standing over her, yelling, and calling her names. The district court discredited this testimony and found (1) "[t]he subject of whether [Mr. Stouffer] was on death row was never discussed during deliberations," and (2) the other jurors "were not influenced by [Juror Vetter] or any other juror in determining their verdict." ROA, Vol. 1 at 486. It also found "[n]one of the jurors witnessed any verbal or non-verbal communication between Juror Vetter and anyone in the gallery." *Id.* Mr. Stouffer does not challenge these findings on appeal, and we therefore do not address them.